*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *KATHERINE MORGAN,* | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | *No. 2:15-cv-00107-GZS* |
| | ) | |
| *CAROLYN W. COLVIN, in her* | ) | |
| *Official Capacity as Acting* | ) | |
| *Commissioner of Social Security,* | ) | |
| | ) | |
| *Defendant* | ) | |

*RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT*

Defendant Carolyn W. Colvin, acting commissioner of the Social Security Administration ("SSA"), moves for summary judgment as to all three claims against her by plaintiff SSA Administrative Law Judge ("ALJ") Katherine Morgan, for retaliation (Count I), sex discrimination (Count II), and age discrimination (Count III). *See* Defendant's Motion for Summary Judgment ("Motion") (ECF No. 63) at 3; First Amended Complaint and Demand for Jury Trial ("Amended Complaint") (ECF No. 38) ¶¶ 25-53. Morgan concedes that SSA is entitled to summary judgment as to both discrimination claims (Counts II and III). *See* Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Opposition") (ECF No. 89) at 3. However, she opposes summary judgment with respect to her claim for retaliation (Count I). *See id.* For the reasons that follow, I conclude that Morgan fails to raise a triable issue on that claim. Hence, I recommend that the court grant the Motion.

## I.   Applicable Legal Standards

### A.   Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). "A dispute is genuine if 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." *Johnson v. University of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Johnson,* 714 F.3d at 52. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (quoting *Clifford v. Barnhart,* 449 F.3d 276, 280 (1st Cir. 2006) (emphasis omitted)); Fed. R. Civ. P. 56(c). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

### B.  Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported

by a specific record citation. *See id*. The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with an appropriate record citation. *See id*. The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id*. The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id*.

Local Rule 56 directs that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(f). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id*.; *see also, e.g., Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## II.  Factual Background

The parties' statements of material facts, credited to the extent that they are either admitted or supported by record citations in accordance with Local Rule 56, with disputes resolved in favor of Morgan as the nonmovant, reveal the following.[1]

### A.  Context

Morgan has been an ALJ in the Portland Hearing Office of the Office of Disability Adjudication and Review ("ODAR") since 1994.  Joint Factual Stipulations ("Stipulations") (ECF No. 57) ¶ 1.[2]  ODAR is the component within the SSA that is responsible for holding hearings, issuing decisions, and reviewing appeals as part of the SSA's process for determining whether or not a person may receive benefits.  *Id*.  ALJs like Morgan conduct *de novo* hearings and make decisions on appeal of determinations involving retirement, survivors, and disability benefits.  *Id*.

### 1.  Portland Hearing Office and Boston Regional Office Staff

During the time period relevant to this case, approximately July 2013 through August 2014, Morgan was one of six ALJs in the Portland Hearing Office.  *Id*. ¶ 2.  In July 2013, she was 69 years old.  *Id*.  At all relevant times, Morgan's direct supervisor was Judge Guy Fletcher, the Hearing Office Chief Administrative Law Judge ("HOCALJ") in Portland, and her second-line supervisor was Judge Carol Sax, the Regional Chief Administrative Law Judge ("RCALJ") for New England ("Region 1"), headquartered in Boston, Massachusetts (the "Boston Regional Office").  *Id*. ¶¶ 3-4.  Sax reported to the Chief Judge for all of ODAR, Debra Bice.  *Id*. ¶ 4.  At all relevant times, Fletcher was in his early 60s, and Sax was in her mid-60s.  *Id*. ¶¶ 3-4.

---

[1] Statements that are qualified are assumed to be admitted subject to that qualification, unless a qualification indicates otherwise.  To the extent that I have incorporated one side's qualification into the statement of the other, I have determined that the qualification is supported by the record citation(s) given.  I have omitted qualifications that are unsupported by the citation(s) given or are redundant.  To the extent that I have taken into consideration a denial of a statement, I have determined that the denial is supported by the citation(s) given.

[2] SSA clarifies that it disputes many of the facts set forth in the Stipulations but admits them for purposes of summary judgment only, pursuant to Local Rule 56(g).  *See* Stipulations at 1 n.1.

As the RCALJ for Region 1, Sax was responsible for supervising eight hearing offices, located in Connecticut, Rhode Island, Massachusetts, New Hampshire, and Maine.  *Id.* ¶ 5.  The Portland Hearing Office was the only hearing office in Maine.  *Id.*  During the time that Sax served as RCALJ, Edward ("Ted") Malvey, the Regional Attorney in Region 1, served as her principal adviser on legal matters, including labor and employment matters.  *Id.* ¶ 6.  As Regional Attorney, Malvey, who worked in the Boston Regional Office, also assisted and advised the management teams in each of the eight hearing offices in Region 1.  *Id.*

Every hearing office within ODAR has a Hearing Office Director ("HOD").  *Id.* ¶ 8.  The HOD is responsible for overseeing the day-to-day operations of the office.  *Id.*  At all relevant times, Stephanie Korupp, who is not an attorney, was the HOD in the Portland Hearing Office.  *Id.*

During the relevant time period, the other ALJs in the Portland Hearing Office were John Melanson, John Edwards, Vickie Evans, Edward Gaulin, and Joseph Shortill.  *Id.* ¶ 9.  Melanson and Edwards were in their early 50s, Evans was in her early 40s, Gaulin was in his early 80s, and Shortill was in his early 70s.  *Id.*  In addition to the ALJs, ODAR employs a variety of support staff in the Portland Hearing Office, namely, Case Technicians, Attorney Advisers, Paralegal Analysts, a Contact Representative (who also serves as a receptionist), an Administrative Assistant (who is also responsible for entering employees' time into SSA's web-based payroll system), a Case Intake Technician, and a Hearing Office Systems Administrator.  *Id.* ¶ 10.

During the relevant time period, Mary Franklin was the Administrative Assistant (and timekeeper).  *Id.* ¶ 11.  Magda Ortiz and Ellen Munsey were the two Group Supervisors, responsible for directly supervising all non-ALJ staff in the office.  *Id.* ¶ 13.  Ortiz and Munsey reported directly to Korupp.  *Id.*  Fletcher, as the HOCALJ, Korupp, as the HOD, and Ortiz and

Munsey, as Group Supervisors, comprised the management team at the Portland Hearing Office at all times pertinent to this case. *Id.* ¶ 14.

## 2. Time and Attendance Policies

During all relevant times, all full-time ODAR employees, including ALJs, were required to work eight and a half hours a day or use approved leave for hours when they were not working. *Id.* ¶ 33. All ODAR employees, including ALJs, were required to sign in at the beginning of their workday and sign out at the end. *Id.* The ALJs in the Portland Hearing Office were supposed to sign in and out every day on a paper sign-in sheet that Fletcher kept in his office for that purpose. *Id.* On the sign-in sheet, each ALJ was required to record the time that he or she arrived in the office and the time when he or she left the office at the end of the day. *Id.* Approved leaves of absence (typically either sick leave or annual leave) could be taken in 15-minute increments. *Id.* Franklin, the timekeeper in the Portland Hearing Office, used the paper sign-in sheets to enter time and leave for every ALJ into SSA's web-based timekeeping system, "WebTA." *Id.* ¶ 44 n.2.

During the relevant time period, ODAR permitted ALJs to work at a designated location outside of the office on certain days of the week, up to eight days a month, so long as the days and locations were approved in advance. *Id.* ¶ 34. ODAR's telework policy was known as the "Flexiplace" policy. *Id.* Most ALJs typically worked from home on their approved Flexiplace days. *Id.* Morgan typically worked from home pursuant to the Flexiplace policy on Mondays and Fridays. *Id.*

When ALJs worked outside of the office on their Flexiplace days, they were required to account for the matters on which they were working as well as hours worked. *Id.* ¶ 35. Each ALJ (including Morgan) was required to submit a separate Flexiplace sign-in sheet for each day he or she worked out of the office. *Id.* The Flexiplace sign-in sheet was identical to the sign-in sheet

6

used by ALJs in the office.  *Id.*  It contained lines where an ALJ was supposed to indicate his or her start and end time for each workday as well as any periods of leave taken during the workday. *Id.*

During the workday, each ODAR employee was given two 15-minute break periods and one 30-minute period for lunch.  *Id.* ¶ 36.  At the Portland Hearing Office, it was acceptable for employees, including ALJs, to aggregate those break periods and take an hour break for lunch.  *Id.*

At all relevant times, ALJs were permitted to earn "credit" hours when they worked more than eight hours in any given day.  *Id.* ¶ 37.  Credit hours could be used in lieu of sick or annual leave by an ALJ.  *Id.*

ODAR employees who wish to take time off from work to observe religious holidays are permitted to earn so-called Religious Compensatory Time ("RCT"), which permits them to "repay" time used for religious holidays on specific terms and conditions, when approved in advance by the HOCALJ.  *Id.* ¶ 38.  By earning and applying RCT, the employee is able to avoid using annual leave or taking leave without pay on religious holidays.  *Id.*  The terms and conditions governing the use of RCT are set forth in the collective bargaining agreement between ALJs and SSA (the IFPTE contract).  *Id.*

### 3.  Huntington, West Virginia, Scandal and Repercussions

In May 2011, the Wall Street Journal published a scathing article about the high approval rate of ALJ David Daugherty in Huntington, West Virginia.  Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment ("Defendant's SMF") (ECF No. 64) ¶ 38; Plaintiff's Opposing Statement of Material Facts Pursuant to District of Maine Local Rule 56(c) ("Plaintiff's Opposing SMF") (ECF No. 83) ¶ 38.  In the article, the reporter noted that Daugherty was not the only SSA ALJ who awarded benefits to the vast majority of claimants who

appeared before him.  *Id*.  The article included a scattershot graph depicting the number of other "outlier" ALJs who awarded benefits more frequently than the average ALJ nationwide.  *Id*.

The Wall Street Journal article triggered a congressional investigation into high allowance rates of ALJs nationwide.  *Id*. ¶ 39.  In October 2013, the Senate Committee on Homeland Security and Government Affairs published a report titled, "How Some Legal, Medical, and Judicial Professionals Abused Social Security Disability Programs for the Country's Most Vulnerable: A Case Study of the Conn Law Firm."  *Id*.  In that report, the Senate Committee also faulted SSA for overlooking Daugherty's noncompliance with SSA's policies and rules regarding time and attendance.  *Id*.  It noted that his "time and attendance problems grew to such a level" that another ALJ in the hearing office "filed allegations of misconduct against Judge Daugherty with the agency's Office of Inspector General."  *Id*.

Beginning in early 2011 and continuing through 2014, ODAR Deputy Commissioner Glenn Sklar frequently communicated the importance of compliance with the agency's time and attendance and leave policies on regularly scheduled nationwide calls with the management teams in every hearing office, including the Portland Hearing Office.  *Id*. ¶ 40.

In December 2013, ODAR also embarked on a new campaign called "See Something, Say Something" to encourage employees in the field to report any type of potential misconduct.  *Id*. ¶ 41.  ODAR created a dedicated mailbox through which employees could report suspicious activities.  *Id*.  In an effort to ensure that every ODAR employee was aware of the "See Something, Say Something" campaign, ODAR executives placed a large, clickable icon in the center of the Intranet home page of every employee.  *Id*. ¶ 42.  As a result, executives at ODAR received hundreds of complaints in the "See Something, Say Something" mailbox.  *Id*.  Those complaints were then triaged by a specially-dedicated staff in the Office of the Deputy Commissioner.  *Id*.

8

In addition to the "See Something, Say Something" campaign, SSA's Office of the Inspector General ("OIG") had an online form on its website through which anyone, including members of the public, could report allegations of "fraud, waste and abuse concerning SSA programs and operations." *Id.* ¶ 43. Anyone using the online form had the option of remaining "confidential," "anonymous," or both. *Id.*

### 4. Morgan's History of Time and Attendance Issues

Beginning as early as 2011, Morgan occasionally failed to submit Flexiplace time sheets in a timely fashion. Defendant's SMF ¶ 1; Plaintiff's Opposing SMF ¶ 1.[3] She also frequently failed to submit leave slips in a timely fashion to Fletcher and Franklin and frequently entered incorrect arrival times on the sign-in sheet used by the ALJs, indicating that she had arrived at the office earlier than she had in fact arrived. Defendant's SMF ¶ 1; Declaration of Guy Fletcher ("Fletcher Decl.") (ECF No. 66) ¶ 16; Declaration of Mary M. Franklin ("Franklin Decl.") (ECF No. 67) ¶¶ 14, 18; Declaration of Stephanie Korupp ("Korupp Decl.") (ECF No. 69) ¶ 12.

When that occurred, Fletcher would email Morgan to request that she provide the missing documentation and/or correct the sign-in sheets. Defendant's SMF ¶ 2; Plaintiff's Opposing SMF ¶ 2. For example, on January 31, 2011, Fletcher emailed Morgan requesting that she provide 24 missing Flexiplace time sheets dating as far back as November 2010. *Id.* ¶ 3. With respect to one date in that period, December 23, 2010, Fletcher wrote, "December 23 is a mystery. I don't have

---

[3] Morgan's request to strike paragraph 1 on the basis that it contains multiple facts not followed by an appropriate record citation pursuant to Local Rule 56(b), *see* Plaintiff's Opposing SMF ¶ 1, is ***DENIED***. The paragraph, which contains one four-line sentence followed by citations to specific paragraphs of three declarations, *see* Defendant's SMF ¶ 1, passes muster pursuant to the rule, *see, e.g., Donahue v. Clair Car Connection, Inc.*, 736 F.Supp.2d 294, 298 n.2 (D. Me. 2010) ("Local Rule 56 does not mandate that each paragraph contain only one sentence[,]" and a paragraph that does not exceed 12 lines is not "so lengthy as to merit [its] disregard.") (citations omitted). However, viewing the facts in the light most favorable to Morgan as nonmovant, I substitute her admission that she "occasionally" failed to turn in time sheets in a timely fashion for SSA's statement that she "frequently" did so. Morgan also denies that she frequently failed to turn in leave slips in a timely fashion, admitting that she occasionally failed to do so, *see* Plaintiff's Opposing SMF ¶ 1; however, that assertion is not supported by the citation given, which pertains only to time sheets.

a sheet of any cases you took home that day, but I also don't have a leave slip.  Please provide me with a leave slip or [F]lexiplace time sheet as appropriate."  *Id.*

In the same email, Fletcher noted that Morgan had incorrectly signed in on January 27, 2011, and asked that she amend the sign-in sheet.  *Id.* ¶ 4.   Fletcher wrote:

> You show yourself as signing in at 9:15, but I know that people were still asking about you and whether you were coming in until after 9:30, and my understanding from a couple of people is that you came in at about 9:45.  That is consistent with the hearing record, which shows your hearing starting at 10:00.  Please amend your sign in time, and provide a leave slip for the time between 9:30 and your arrival . . . .

*Id.*

Two months later, on March 30, 2011, Fletcher again wrote to Morgan requesting several months of missing Flexiplace time sheets and asking that she submit a leave slip to account for a "long lunch" taken on February 24, 2011.  *Id.* ¶ 5.  On June 3, 2011, he again wrote to Morgan about missing leave slips, in an effort to "get our timesheets in order."  *Id.* ¶ 6.  With respect to March 29, 2011, he noted:

> When we discussed this day before, you indicated that you had it down in your book as a day on which you did hearings.  I was able to track down your itinerary for that day, but when I go into each of the cases, the schedule screen shows that you requested on March 28 that the day be cancelled.  Was this possibly one of the days where you were dealing with your finger?  In any event, you never signed in on March 29.  As such, I think I need a leave slip or possibly a [F]lexiplace time sheet, though I can't find anything suggesting that you took work home for that day. . . .

*Id.*

Morgan's failure to provide time sheets and leave slips on a timely basis, and to account accurately for her time in general, was a chronic source of stress for Fletcher, Korupp, and Franklin.  Defendant's SMF ¶ 7; Fletcher Decl. ¶ 22; Franklin Decl. ¶¶ 14, 23; Korupp Decl. ¶ 13.[4]

---

[4] Morgan denies this, asserting that between 2010 and 2013 she was not a chronic source of stress for Fletcher but an ally, whom he trusted and with whom he had a good working relationship, and she was probably his most productive judge.  Plaintiff's Opposing SMF ¶ 7.  However, these assertions neither contradict SSA's statement that Morgan's *time and attendance difficulties* caused Fletcher chronic stress nor address the impact on Korupp or Franklin.

No other ALJ in the Portland Hearing Office was as delinquent as Morgan when it came to providing timely and accurate information about his or her time, attendance, and leave. Defendant's SMF ¶ 8; Fletcher Decl. ¶ 22; Franklin Decl. ¶ 14.[5]

Fletcher also had to press Morgan to comply with ODAR's policies regarding RCT. Defendant's SMF ¶ 9; Plaintiff's Opposing SMF ¶ 9.  For example, on November 13, 2011, he wrote to her:

> As I think you know, whenever a person takes religious comp, he/she is also supposed to submit a plan or schedule as to how the time will be repaid. . . .  [T]his is an area in which Falls Church is taking increasing interest.  As of early last week, payroll records showed that you 'owe' the agency 6.15 hours of religious comp. Could you please respond to this email with information as to how the time will be repaid. . . .

*Id.*[6]

On September 26, 2012, Fletcher emailed Morgan again about a number of time and attendance matters.  *Id.* ¶ 12.  He asked Morgan to provide him with several months' worth of missing timesheets, a missing repayment plan for RCT, a missing signature on a sign-in sheet, and a missing leave slip.  *Id.*[7]  He wrote: "Any time you work 6 hours or more, it will be assumed that

---

[5] Morgan's request to strike paragraph 8 on the basis that it constitutes opinion, not fact, *see* Plaintiff's Opposing SMF ¶ 8, is ***DENIED***.  As SSA rejoins, *see* Defendant's Responses to Plaintiff's Requests To Strike ("Defendant's Strike Responses"), commencing on page 1 of Defendant's Responses to Plaintiff's Requests To Strike and to Plaintiff's Additional Statement of Undisputed Material Facts ("Defendant's Responses/Reply SMF") (ECF No. 94), ¶ 8, the statement is one of fact in the sense that it is "susceptible to objective verification[,]" *Perez v. Volvo Car Corp.*, 247 F.3d 303, 316 (1st Cir. 2001) (citation and internal quotation marks omitted).  In addition, lay opinions are admissible to the extent rationally based on the witness's perception.  *See* Defendant's Strike Responses ¶ 8; Fed. R. Evid. 701. That is the case here: during the relevant period, both Fletcher and Franklin had responsibility for ALJs' submission of timely and accurate time sheets and leave slips.  *See* Fletcher Decl. ¶¶ 3, 16-22; Franklin Decl. ¶¶ 2-3, 12.  In the alternative, Morgan denies paragraph 8, *see* Plaintiff's Opposing SMF ¶ 8; however, her assertions that Fletcher testified that he had a good working relationship with her, that she was his ally, and that she was probably the highest producing judge in the Portland office, *see id.*, do not controvert it.

[6] I omit Defendant's SMF ¶¶ 10-11, which Morgan denies, *see* Plaintiff's Opposing SMF ¶¶ 10-11, viewing the record in the light most favorable to Morgan as nonmovant.

[7]  I ***GRANT*** Morgan's request to strike Defendant's SMF ¶ 13 on the basis that Franklin's statement concerning Fletcher's reminders to Morgan is hearsay, *see* Plaintiff's Opposing SMF ¶ 13.  SSA argues that the statement is not offered for the truth of the matter asserted therein, which it characterizes as SSA's policy regarding combining lunch and leave, but rather to establish that Fletcher had to remind Morgan numerous times about the policy.  *See* Defendant's Strike Responses ¶ 13.  However, in context, the statement is offered for the truth of the latter assertion,

you have taken a ½ hour lunch.  So, on 9/20, when you signed out after 6 ½ hours, you will be charged with two hours of leave rather than 1 ½ hours.  We have discussed this on many occasions."  *Id*. ¶ 14.  Despite these frequent reminders, Morgan continued to have problems complying with basic time and attendance requirements, even though she had been an ALJ for many years and had herself been a HOCALJ at one time.  *Id*. ¶ 15.[8]

On October 2, 2012, Korupp called Carolyn Tedino at the Boston Regional Office to express her misgivings about the discrepancies between Morgan's timesheet and what she had personally observed that day.  *Id*. ¶ 17.  She knew that Franklin was going to be out of the office that week and that she would have to certify Morgan's time for that pay period.  *Id*.  During the phone call, Tedino warned Korupp that the HOD is always the "last to know and the first held accountable."  *Id*. ¶ 18.  Korupp interpreted that comment to mean that her career could be adversely affected if Morgan's unchecked abuse of the agency's time and attendance rules continued.  *Id*.

Korupp also spoke with Fletcher about the matter and told him that she did not feel comfortable certifying Morgan's time.  *Id*. ¶ 19.  Korupp suggested that they post Morgan's unaccounted-for time as Absent Without Leave ("AWOL").  *Id*.  Fletcher was not comfortable posting Morgan's time as AWOL and instead directed Korupp to post the time normally (*i.e.*, as regular "duty" time), create a memory jogger, and then let him resolve the discrepancy when he returned to the office.  Defendant's SMF ¶ 20; Korupp Decl. ¶ 10; Korupp Dep. Exh. 1 (ECF No.

---

rendering it hearsay.  *See* Fed. R. Evid. 801(c) (Hearsay is a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement.").

[8] I omit Defendant's SMF ¶ 16, material portions of which Morgan denies, *see* Plaintiff's Opposing SMF ¶ 16, viewing the evidence in the light most favorable to Morgan as nonmovant.

53), Exh. E1 to Stipulated Record ("Stip. Rec.") (ECF No. 49), at Page ID # 1700.[9]  This same scenario happened repeatedly with Morgan while Korupp was the HOD.  Defendant's SMF ¶ 21; Plaintiff's Opposing SMF ¶ 21.[10]

The postponement of hearings on short notice had an adverse impact on both staff and claimants, contributed to the backlog of cases, and was something that ODAR tracked closely.  *Id.* ¶ 23.  In December 2011, which was part of fiscal year 2012, Fletcher attempted to address the issue with Morgan, writing:

> Not too surprisingly, your leave request for the week of December 19 has set off a bit of a firestorm in [the] Regional Office.  They are, to put it mildly, very upset at the idea that three days' worth of hearings is likely to be lost in this month's dispositions, as well as the fact that there are now a bunch of claimants who thought they would have their hearing before Christmas who will now have to wait for several additional months.  Based on that, I have been directed to obtain from you a doctor's note for the appointment you have that week.  This is consistent with the contract.  In addition, if you need to reschedule cases in the future, you need to go through me or through Stephanie.  I will be sending an email to all of the judges to this effect.  Last minutes [sic] changes like this wreak havoc on our efforts to meet goals and to keep the [Regional Office] up to date on how we're doing. . . .

*Id.* ¶ 24.

On July 31, 2013, Morgan canceled all hearings she had scheduled for the following day, August 1, 2013, and submitted a leave slip for annual leave on that day.  Stipulations ¶ 45.  On August 6, 2013, Fletcher wrote to her asking why she had cancelled those hearings with only one day's notice and taken annual leave.  *Id.* ¶ 46.  In his email, Fletcher noted that "canceling and postponing at the last minute puts a lot of strain on the staff, and represents a lot of wasted effort in having scheduled the hearings in the first place."  *Id.*

---

[9] Morgan denies this statement, *see* Plaintiff's Opposing SMF ¶ 20; however, her assertion that Fletcher never instructed Korupp to keep an unofficial personnel file on Morgan does not controvert it.
[10] I omit Defendant's SMF ¶ 22, which Morgan denies, *see* Plaintiff's Opposing SMF ¶ 22, viewing the evidence in the light most favorable to Morgan as nonmovant.

Morgan responded to Fletcher's email on August 7, 2013. *Id.* ¶ 47. She stated that she had a "non medical unexpected matter" that she had to attend to on August 1, 2013. *Id.* She noted that she was "not the only judge in the office" who "has ever cancelled a hearing for non medical reasons," stating:

> I do believe there is at least one (male) judge in this office who cancels or postpones hearings more than a bit for non medical reasons. That judge has a much lower production rate than I do. I'm wondering if production and efficiency count for anything in this office?

*Id.* Fletcher responded on August 9, 2013, apologizing for his belated response and writing:

> I understand your concern, but do question why you assume that you are the only person I've spoken to about cancelling or postponing hearings. I do my best to have such matters are [sic] addressed on a strictly one-to-one basis. In any event, yes production and efficiency do count for a lot, and I greatly appreciate your ongoing contributions to the success of this office. In this regard, I am joined by entire [sic] management team. However, I am also charged with trying to ensure that we operate in a way that promotes the efficiency of everyone.

*Id.* ¶ 48. Morgan always informed the management team when it was necessary to cancel hearings. Plaintiff's Additional Statement of Undisputed Material Facts ("Plaintiff's Additional SMF"), commencing on page 26 of Plaintiff's Opposing SMF, ¶ 25; Declaration of Katherine Morgan ("Morgan Decl.") (ECF No. 86) ¶ 8.[11]

On or about August 26, 2013, Franklin told Korupp that she felt "uncomfortable" posting Morgan's time for that pay period because she did not believe that it was accurate. Stipulations ¶ 49. Korupp told Franklin to bring her concerns regarding Morgan's timesheets to Fletcher's attention. *Id.* Franklin subsequently communicated her concerns to Fletcher. *Id.* ¶ 50. She made contemporaneous handwritten notes regarding her observations and entered them in the "Pay Period Remarks" section of Morgan's WebTA timesheet for that pay period. *Id.*

---

[11] SSA denies this, *see* Defendant's Responses to Plaintiff's Additional Statement of Undisputed Material Facts ("Defendant's Reply SMF"), commencing on page 28 of Defendant's Responses/Reply SMF, ¶ 24; however, I view the evidence in the light most favorable to Morgan as nonmovant.

On August 26, 2013, Fletcher emailed a memo to Morgan regarding a number of "time and attendance issues." *Id.* ¶ 51.  He informed her that an entry of 30 minutes of "AWOL" was made on August 20 and 22, 2013, because the leave slips she had submitted for those two days did not account for 30 minutes on each of those days. *Id.*  He invited her to amend her leave slips for those two days to ensure that her paycheck would not be "one hour short." *Id.*  He also asked her to submit a leave slip for a quarter-hour on August 14, 2013, because he had "received information" that she had arrived 15 minutes later than the time reflected on her sign-in sheet. *Id.*  Finally, he questioned her entitlement to so-called "credit hours" on August 15, 2013, because he had been informed that she had taken a two-hour lunch that day. *Id.*  The information in his memo was based on information that Franklin had provided to him. *Id.*

Morgan responded in an August 29, 2013, email to Fletcher, indicating that she would amend her leave slips for August 20 and 22 to account for the two 30-minute blocks of time but refused to sign leave slips for August 14 and 15. *Id.* ¶¶ 52-53.  She denied that she had arrived late on August 14 or taken a two-hour lunch on August 15. *Id.* ¶ 53.  In that email, she also asserted that Fletcher was creating a "hostile work environment" for her by questioning her compliance with time and attendance policies. *Id.*  She stated that she believed that she was being "singled out for disparate treatment based on [her] age and gender" and asserted that Melanson and Edwards frequently took long lunches and/or breaks during the day. *Id.*  Finally, she reiterated her belief that Fletcher had treated her "in a disparate manner" when he questioned her cancellation of hearings on August 1. *Id.*  She wrote that Melanson "cancels cases frequently" on short notice. *Id.*  She concluded: "I only hope this can be resolved amicably and that you and your anonymous informants will cease and desist from singling me out for monitoring and disparate treatment." *Id.*

Fletcher believed that Morgan's perception that Melanson cancelled as many hearings as she did was misplaced.  Defendant's SMF ¶ 27; Plaintiff's Opposing SMF ¶ 27.

On August 20 and 22, 2013, Franklin noted that Morgan worked part of each day and took leave for several hours each afternoon, leaving 30 minutes each day unaccounted for.  Defendant's SMF ¶ 34; Plaintiff's Opposing SMF ¶ 34.  Franklin made contemporaneous handwritten notes regarding her observations of Morgan's behavior on August 14, 15, 20, and 22, 2013, and also entered her observations in the "Pay Period Remarks" section of Morgan's WebTA time sheet for that pay period.  *Id.*

Morgan's disregard for the agency's time and attendance rules was a topic of frequent discussion within the Portland Hearing Office long before December 2013.  *Id.* ¶ 36.  Morgan never intentionally entered an incorrect arrival time on a sign-in sheet.  Plaintiff's Additional SMF ¶ 28; Morgan Decl. ¶ 6.[12]

### B.  Alleged Instances of Retaliation on Account of Protected Activity

### 1.  Sax's December 11, 2013, Disclosure of Existence of OIG Investigation

On July 29, 2013, Edwards filed an anonymous complaint about his colleague Morgan with the SSA's OIG using a link provided on the OIG's website for reporting fraud, waste, and abuse.  Stipulations ¶ 40.  Edwards, who did not identify himself, asked the OIG to investigate Morgan for "blatant abuses of time [and] attendance" rules and other violations of SSA policies, including

---

[12] SSA denies this, *see* Defendant's Reply SMF ¶ 28; however, I view the evidence in the light most favorable to Morgan as nonmovant.  I ***GRANT*** SSA's request to strike Morgan's statements regarding certain SSA workplace policies, *see* Plaintiff's Additional SMF ¶¶ 29-31, on the basis that Donna Brown, whose declaration Morgan cites, does not make clear how she has personal knowledge of the asserted facts, *see* Declaration of Donna Brown ("Brown Decl.") (ECF No. 84); Defendant's Reply SMF ¶¶ 29-31; *Navedo v. Nalco Chem., Inc.*, 848 F. Supp.2d 171, 179 (D.P.R. 2012) (striking statements of declarant when his basis for personal knowledge of the asserted facts was neither set forth in, nor inferable from, his declaration).  Morgan rejoins that Brown states that her declaration supplements her deposition testimony and a prior affidavit, *see* Plaintiff's Responses to Defendant's Requests To Strike ("Plaintiff's Strike Responses") (ECF No. 98) ¶¶ 29-30; however, Brown does not incorporate by reference specific passages of her prior affidavit or deposition testimony, *see* Brown Decl. ¶ 1.

the agency's Flexiplace policies. *Id.* Edwards also questioned Morgan's high allowance rate of claims for disability benefits, noting that she had "the highest approval rate in the office[,]" which was "close to if not exceeding the Administration's outlier status." *Id.*

The OIG assigned the anonymous complaint Allegation Number Q13040689 and referred it to ODAR's Division of Quality Service ("DQS"). *Id.* ¶ 41. DQS is the unit within ODAR's Office of Executive Operations and Human Resources ("OEOHR") responsible for addressing labor and employment issues that arise anywhere in the 10 regions within ODAR. *Id.* On August 20, 2013, DQS referred the allegation to Malvey with instructions to investigate the complaint and report back to DQS. *Id.*

On August 21, 2013, Malvey contacted members of the management team at the Portland Hearing Office to inform them about the OIG complaint and request their assistance in gathering information on Morgan's compliance (or noncompliance) with SSA's time and attendance rules and other policies. *Id.* ¶ 42. Malvey instructed Boston Regional Office employee Maureen Schofield to conduct the investigation. *Id.* ¶ 43. Schofield is a Special Projects Officer with the Boston Regional Office. Defendant's SMF ¶ 56; Plaintiff's Opposing SMF ¶ 56. Since approximately July 2013, she has been "out-stationed" at the Portland Hearing Office, that is, physically located in Portland. *Id.* Between July 2013 and August or September 2015, her office was located directly beside that of Morgan. *Id.*

During the two-year period when Schofield's office was next to Morgan's, Schofield typically arrived in the office between 6:30 and 7:30 in the morning and was generally there before Morgan. Defendant's SMF ¶ 60; Declaration of Maureen Schofield ("Schofield Decl.") (ECF No.

73) ¶ 9.[13]   Based on her own first-hand observations, Schofield believed that there were many occasions when Morgan arrived later than the times she indicated on the judges' sign-in sheet and took long lunch breaks, often in excess of two hours, in violation of the agency's rules and policies. Defendant's SMF ¶ 61; Plaintiff's Opposing SMF ¶ 61.   Schofield also noticed that Morgan's behavior seemed to worsen whenever Fletcher was out of the office.   *Id.*[14]   Morgan's apparent unwillingness (or inability) to comply with the agency's time and attendance rules has been a topic of discussion since Schofield arrived at the Portland Hearing Office in July 2013.   *Id.* ¶ 62. Schofield doubts whether Morgan herself realized how frequently she bends the rules when it comes to properly accounting for her time and attendance.   *Id.*

When Malvey contacted the management team in the Portland Hearing Office, he asked that they provide Schofield with copies of certain documents for the previous four months, including Morgan's sign-in sheets (for office and Flexiplace days), leave requests, leave denials/approvals, and WebTA records.   Stipulations ¶ 44.

On September 11, 2013, Schofield provided a report of her findings to Malvey.   *Id.* ¶ 54. Schofield noticed "some discrepancies, but nothing egregious."   Plaintiff's Additional SMF ¶ 58; Exh. A (ECF No. 85-1) to Declaration of Benjamin N. Donahue ("Donahue Decl.") (ECF No. 85).[15]   She noted that Morgan often did not properly complete Flexiplace logs, did not timely submit time sheets for processing by Franklin, attempted to take her lunch break within the last

---

[13] I omit SSA's further assertion that Schofield "had the ability to see when Morgan arrived each day[,]" Defendant's SMF ¶ 60, which Morgan denies, *see* Plaintiff's Opposing SMF ¶ 60, viewing the evidence in the light most favorable to Morgan as nonmovant.

[14] Morgan qualifies this paragraph, *see* Plaintiff's Opposing SMF ¶ 61, admitting that Schofield's beliefs are what they are but denying that her attendance record worsened when Fletcher was out of the office, *see* Morgan Decl. ¶ 20.

[15] SSA's request to strike this paragraph on the basis that it constitutes inadmissible hearsay, *see* Defendant's Reply SMF ¶ 58, is ___**DENIED**___.   As Morgan argues, *see* Plaintiff's Strike Response ¶ 58, the statement fits an exception to the hearsay rule for statements offered against a party that were "made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]"   Fed. R. Evid. 801(d)(2).   In the alternative, SSA denies the statement, *see* Defendant's Reply SMF ¶ 58; however, I view the evidence in the light most favorable to Morgan as nonmovant.

two hours of the day in violation of agency policy, failed to account for the last half hour of her workday because she improperly combined leave with lunch, and made frequent changes to her start and end times on sign-in sheets.  Defendant's SMF ¶ 58; Plaintiff's Opposing SMF ¶ 58.  She also reported that, on two occasions, she personally observed Morgan arrive at the office 15 minutes later than the arrival time Morgan entered on the judges' sign-in sheet.  *Id*. ¶ 59.

Malvey made a few minor editing changes and forwarded the report to DQS.  Stipulations ¶ 55.  On December 5, 2013, Randall Arrand, an employee in ODAR's OEOHR who received the report from DQS, submitted it electronically to the OIG.  *Id*.  On the form that accompanied the electronic submission, he checked a box indicating:  "Allegation substantiated – corrective action taken – no fraud involved."  *Id*.

On December 11, 2013, approximately a week after ODAR had submitted the DQS report electronically to the OIG, Sax traveled to the Portland Hearing Office to meet with Morgan.  *Id*. ¶ 56.  Before that meeting, both Fletcher and Sax asked Malvey whether they had an obligation to disclose the existence of the OIG allegation to Morgan under the terms of the collective bargaining agreement between the ALJ corps and the agency.  *Id*. ¶ 57.  Malvey consulted with employees at SSA's Office of Labor Management and Employee Relations and thereafter advised both Fletcher and Sax that they should not discuss the OIG allegation, or the possibility of an OIG investigation, with Morgan.  *Id*.  Fletcher and Sax were under instructions from the Chief Judge's Office not to inform Morgan that she was the subject of an OIG investigation.  Plaintiff's Additional SMF ¶ 38; Defendant's Reply SMF ¶ 38.  Malvey also advised Fletcher that, pursuant to the ALJ contract, Morgan "will be notified when the OIG investigation is complete."  Plaintiff's Additional SMF ¶ 41; Sax Dep. at Page ID # 1193.[16]

---

[16] I substitute Fletcher for Sax, **_GRANTING_** SSA's request to strike the reference to Malvey having so informed Sax as unsupported by the citation given.  *See* Defendant's Reply SMF ¶ 41.

Sax and Fletcher met with Morgan on the morning of December 11, 2013, and discussed time and attendance issues with her.  Stipulations ¶ 58.  Sax also talked about Senator Coburn and the West Virginia situation and advised that the OIG was investigating ALJs with high production and high payment rates.  *Id.*  During the meeting, Morgan asked Sax point blank whether she (Morgan) was the subject of an OIG investigation.  *Id.*  Sax responded in the negative.  *Id.*

At the end of the meeting, Morgan asked for an opportunity to speak privately to Sax.  *Id.* ¶ 59.  In that meeting, she informed Sax that she believed she had been subjected to harassment by her colleagues and that Fletcher had condoned the inappropriate behavior of Edwards and Melanson.  *Id.*  She told Sax that she believed Melanson, Edwards, and Fletcher were hostile to older women and that they had treated her in a hostile and disrespectful manner in judges' meetings.  *Id.*  Sax responded, "Yes, I really should have done something to stop them," referring to times that Edwards and Melanson had treated her (Sax) in a hostile, disrespectful manner.  *Id.*[17]

After lunch, and in violation of her specific instructions from the Chief Judge's Office and Malvey, Sax returned to Morgan's office and told her about the OIG allegation.  *Id.* ¶ 60; Plaintiff's Additional SMF ¶ 39; Defendant's Reply SMF ¶ 39.[18]  After Sax informed Morgan that she was the subject of an OIG investigation, the conversation was over.  Plaintiff's Additional SMF ¶ 40; Defendant's Reply SMF ¶ 40.  Morgan was very distraught that Sax told her that she was the subject of an OIG investigation.  Stipulations ¶ 60.  During the early morning hours of December 12, 2013, Morgan sent an email to Fletcher expressing how upset she was about the anonymous

---

[17] Sax denies that she made this statement or ever felt mistreated by Melanson and Edwards.  Stipulations ¶ 59 n.5.  However, for purposes of summary judgment, SSA accepts it as true.  *Id.*

[18] I omit Morgan's further assertion that this disclosure was in violation of SSA protocol, *see* Plaintiff's Additional SMF ¶ 39, ***GRANTING*** SSA's request to strike it on the basis that it is unsupported by the citations given, *see* Defendant's Reply SMF ¶ 39.

complaint to OIG about her.  *Id.* ¶ 61.  She asserted that she had been the victim of age and gender

discrimination, writing:

> I am still in a state of shock and greatly disturbed.  I have been unable to function
> or sleep since the disturbing news.  As you well know, this is a continuation of the
> hostile work environment you have subjected me to for the last year or more.  You
> have allowed Judge Melanson to insult me and interfere with my judicial
> independence. . . .  You have allowed Judge Melanson to continue staring at me
> and making faces whenever our paths cross.  You have condoned Judge Melanson's
> false accusation regarding falsifying a sign out sheet (by three minutes) on at least
> one occasion.  At judges' meetings, you have condoned Judge Melanson and Judge
> Edwards speaking to me with disdain, aggression, and hostility. . . .  I have told you
> that I am being singled out for abuse by Judges Melanson and Edwards because of
> my age and gender.

*Id.*

Fletcher forwarded Morgan's email to Sax and let Morgan know he had done so.  *Id.* ¶ 62.

On January 10, 2014, Morgan sent a three-page, single-spaced email to Sax directly, again

asserting that she believed she had been subjected to a hostile work environment.  *Id.* ¶ 63.[19]

Prior to Sax's and Fletcher's meeting with Morgan on December 11, 2013, OIG had

decided to take no action, deciding that there were no substantiated allegations that required any

discipline.  Plaintiff's Additional SMF ¶¶ 36-37; Defendant's Reply SMF ¶¶ 36-37.[20]  The OIG

had in fact summarily "closed" the anonymous allegation about Morgan on September 28, 2013,

without taking any action.  Defendant's SMF ¶ 121; Plaintiff's Opposing SMF ¶ 121.  The fact

that the OIG had "closed" the allegation in September 2013 was not discovered by ODAR until

February 2015, when Joy Bryan, a Branch Chief at DQS, inquired about the status of the matter

---

[19] I omit Morgan's assertion that allegations that trigger an OIG investigation, even if found unsubstantiated, can destroy an ALJ's reputation and negatively impact his or her career, *see* Plaintiff's Additional SMF ¶ 45, ***GRANTING*** SSA's request to strike it on the basis that it is unsupported by the citation given, *see* Defendant's Reply SMF ¶ 45.
[20] SSA qualifies this statement, *see* Defendant's Reply SMF ¶ 37, asserting that the allegations were "substantiated" but that the Boston Regional Office decided that they did not "require[] any discipline" and elected instead to "counsel Judge Morgan on time and attendance rules and Flexiplace rules[,]" Deposition of Social Security Administration by Edward Malvey, Esq. ("Malvey Dep.") (ECF No. 49-21), Exh. H to Stip. Rec., at Page ID # 1121; Schofield Decl. ¶ 6.

and discovered that the OIG had done nothing.  Defendant's SMF ¶ 122; Sax Dep. Exh. 17 (ECF

No. 49-24), Exh. I-1 to Stip. Rec., at Page ID ## 1256-58; Malvey Dep. at Page ID ## 1115, 1120.[21]

Sax discovered that OIG had closed out the allegation in February 2015.  Defendant's SMF

¶ 123; Declaration of Carol Sax (ECF No. 81) ¶ 14.[22]  At that point, she was exhausted and

distracted by the press of unrelated stressors at work and at home and on the verge of announcing

her decision to step down as RCALJ.  Defendant's SMF ¶ 123; Plaintiff's Opposing SMF ¶ 123.

Sax did not tell Morgan that the OIG had closed the allegation in September 2013 without taking

any action on the anonymous complaint.  *Id*. ¶ 124.  With the benefit of hindsight, Sax

acknowledges that she should have said something to Morgan when she received the update.  *Id*.

¶ 125.

Morgan alleges that SSA's failure to inform her that the OIG investigation was completed

in October 2013 was a "retaliatory act."  *Id*. ¶ 120.

---

[21] Morgan denies this, *see* Plaintiff's Opposing SMF ¶ 122; however, the citations on which she relies do not demonstrate that anyone at ODAR knew before February 2015 that *OIG* had closed its investigation.  *See* Malvey Dep. at Page ID # 1121; Videoconference Deposition of Tammy Farmer (ECF No. 49-29), Exh. L to Stip. Rec., at Page ID # 1452; Farmer Dep. Exh. 13 (ECF No. 49-30), Exh. L-1 to Stip. Rec., at Page ID # 1489.  Morgan relies heavily on an October 16, 2014, email from Valencia Melbane of ODAR to Bryan of DQS stating, "Below is the information found on the subject allegation.  It appears that Randall released a copy of the response via the AMFED response system."  Farmer Dep. Exh. 13 at Page ID # 1489.  However, as Morgan elsewhere admits, the "response" released by "Randall" is ODAR's December 5, 2013, response to the OIG, not OIG's report back to ODAR.  *See* Stipulations ¶ 55; Plaintiff's Strike Responses ¶ 35.  For the same reason, I omit Morgan's statement that Bryan received notice on October 16, 2014, that the OIG investigation had been closed on September 28, 2013, *see* Plaintiff's Additional SMF ¶ 35, ***GRANTING*** SSA's request to strike the statement on the basis that it is unsupported by the citation given, *see* Defendant's Reply SMF ¶ 35.

[22] Morgan denies that Sax discovered this in February 2015, *see* Plaintiff's Opposing SMF ¶ 123, but the citation on which she relies does not support her denial.  While the cited portion of the Malvey deposition indicates that, by December 12, 2013, the OIG had decided to take no action and the Boston Regional Office had decided that there were no substantiated allegations requiring discipline, it does not speak to whether *Sax* knew then that the OIG had decided to take no action.  *See* Malvey Dep. at Page ID #1121.

## 2.  Selective and Hypervigilant Enforcement of Policies

### a.  Sick Leave

Fletcher became aware of Morgan's Equal Employment Opportunity ("EEO") complaint in late June 2014.  Plaintiff's Additional SMF ¶ 18; Defendant's Reply SMF ¶ 18.  In June 2014, Korupp arranged for a private trainer from EAP Consultants, LLC, to come to the Portland Hearing Office on July 16, 2014, at 2:00 p.m. and provide training to all of the employees on "Improving Workplace Communications."  Stipulations ¶ 119.  Morgan's EEO complaint was part of the basis for having the July 16, 2014, training.  Plaintiff's Additional SMF ¶ 9; Defendant's Reply SMF ¶ 9.[23]

On June 13, 2014, and again on July 14, 2014, Korupp sent office-wide reminders to all employees about the training, which was mandatory.  *Id.*  Korupp arranged for this training in large part to address what she perceived as the strained relationship between some of the ALJs, including Morgan.  *Id.*

At 12:27 p.m. on July 15, 2014, the day before the scheduled training, Morgan emailed Fletcher to let him know that she would be requesting sick leave on multiple dates in July and August.  *Id.* ¶ 120.  July 16 was not one of the dates listed in the email.  *Id.*  At 2:46 p.m. on July 15, 2014, Fletcher sent an email to all ALJs reminding them of the "Improving Workplace Communications" training the following day.  *Id.* ¶ 121.  He wrote, "All judges are expected at the afternoon training."  *Id.*  The following day, at 11:53 a.m., Morgan wrote Fletcher indicating that she would not be attending the mandatory training that afternoon because she had scheduled

---

[23] SSA qualifies this statement, asserting that Fletcher testified that the purpose of the training was to address the "rather frozen communications between Judge Morgan and the other judges and even some of the staff" and "get together and talk about ways that we could all treat each other better and have a friendlier office" in the aftermath of Morgan's complaints about a hostile work environment.  Defendant's Reply SMF ¶ 9; Deposition of Guy E. Fletcher ("Fletcher Dep.") (ECF No. 49-18), Exh. G to Stip. Rec., at Page ID # 955.

unanticipated "medical tests" at 1:30 p.m. *Id.* ¶ 122. Fletcher responded by email at 1:03 p.m., stating:

> Katherine,
>
> I do not understand why I am being made aware of this conflict only two hours prior to the training. It has been the subject of a number of emails from Stephanie, the most recent of which was late Monday afternoon. The date was specifically chosen due to the lack of apparent conflicts on the calendar.
>
> The training is mandatory. As such, you should make every effort to be there. If not, please provide me with an explanation as to why the tests could not have been rescheduled.

*Id.* ¶ 123. Morgan responded by email at 1:16 p.m.:

> I just got the appointment this morning after describing my symptoms to my doctor's office and having them reviewed by my doctor. It is very important that I be tested now. My medical condition specifics are confidential but I can tell you that the test cannot wait.

Plaintiff's Additional SMF ¶ 7; Fletcher Dep. Exh. 13 (ECF No. 49-19), Exh. G1 to Stip. Rec., at Page ID # 996.[24]

Shortill missed the same July 16, 2014, training session to attend a medical appointment. Plaintiff's Additional SMF ¶ 8; Defendant's Reply SMF ¶ 8. Both Morgan and Shortill provided doctors' notes to explain their absence from that session. *Id.* ¶ 10.[25] Fletcher took no disciplinary action against Shortill. *Id.* ¶ 11.[26] With respect to Morgan, Fletcher contacted Malvey of the

---

[24] I have quoted from the underlying exhibit, **_GRANTING_** SSA's request to strike Morgan's characterization that she informed Fletcher that she was going to miss the training session because she had to attend an emergency medical appointment. *See* Defendant's Reply SMF ¶ 7. That characterization ignores the stipulated fact that Morgan initially informed Fletcher that she had scheduled unanticipated medical tests. *See* Stipulations ¶ 122. Only when Fletcher questioned that did Morgan state that the test "cannot wait." Fletcher Dep. Exh. 13 at Page ID # 996.

[25] SSA qualifies this statement, asserting that Shortill informed Fletcher about his medical appointment well in advance of the training, while Morgan provided only two hours' notice. Defendant's Reply SMF ¶ 10; Fletcher Dep. at Page ID # 955; Fletcher Dep. Exh. 13 at Page ID # 995.

[26] I omit Morgan's assertion that Fletcher began taking actions to formally discipline Morgan, *see* Plaintiff's Additional SMF ¶ 12, **_GRANTING_** SSA's request to strike on the basis that it is unsupported by the citation given, *see* Defendant's Reply SMF ¶ 12.

Boston Regional Office, inquiring if he could appropriately ask for documentation of her medical appointment and expressing irritation at the last-minute cancellation on top of Morgan's cancellation of other hearings a month earlier and recent leave requests.   Plaintiff's Additional SMF ¶ 13; Fletcher Dep. Exh. 13 at Page ID # 997.[27]   Malvey informed Fletcher that he had spoken "with DQS and we are in agreement that a Weingarten may be needed."   Plaintiff's Additional SMF ¶ 14; Fletcher Dep. Exh. 13 at Page ID # 1002.[28]   Fletcher ultimately approved Morgan's sick leave request for her medical appointment on July 16, 2014.  Stipulations ¶ 124.

Morgan, like many judges, struggled to comply with each and every SSA time and attendance policy.  Plaintiff's Additional SMF ¶ 16; Morgan Decl. ¶¶ 6-7.[29]

### b.  Lunch Breaks

On July 23, 2014, Fletcher wrote Evans to let her know that he would be out of the office for the next week and a half and to ask if she would be willing to serve as acting HOCALJ in his absence.  Stipulations ¶ 125.  She agreed to do so.  *Id.*

---

[27] I have summarized the relevant portion of the underlying exhibit, ***GRANTING*** SSA's request to strike Morgan's characterization that Fletcher "reported" her to the Boston Regional Office.  *See* Defendant's Reply SMF ¶ 13.

[28] I have quoted the relevant portion of the underlying exhibit, ***GRANTING*** SSA's request to strike Morgan's characterization that DQS "recommended proceeding with a formal Weingarten investigation."  *See* Defendant's Reply SMF ¶ 14.  "A 'Weingarten meeting' refers to the Supreme Court's decision in *N.L.R.B. v. J. Weingarten, Inc.,* 420 U.S. 251 (1975), a case in which the Court held that union employees were entitled to the right to insist on the presence of a union representative at an investigatory interview with employer personnel which [they] reasonably believe[] will result in disciplinary action."  *Lerner v. Shinseki,* No. 3:12-CV-00565, 2013 WL 5592906, at *2 n.2 (W.D. Ky. Oct. 10, 2013) (citation and internal quotation marks omitted).

[29] I ***DENY*** SSA's request to strike this paragraph on the basis that the phrase "like many judges" is unsupported by competent, admissible evidence.  *See* Defendant's Reply SMF ¶ 16.  As Morgan rejoins, *see* Plaintiff's Strike Responses ¶ 16, lay opinions are admissible to the extent rationally based on the witness's perception, *see* Fed. R. Evid. 701.  Morgan explains that this opinion was based on her "own observations from years of working at the Portland ODAR[.]" Morgan Decl. ¶ 7.  In the alternative, SSA denies that "many judges" struggled to comply with SSA time and attendance policies, *see* Defendant's Reply SMF ¶ 16; however, I view the evidence in the light most favorable to Morgan as nonmovant.  I omit Morgan's further assertions that (i) her time and attendance compliance is similar to that of other judges in the Portland ODAR office, *see* Plaintiff's Additional SMF ¶ 15, (ii) she works extremely hard and is frequently the only ALJ in the Portland ODAR office to meet SSA's annual case disposition goals, *see id.* ¶ 17, and employment actions involving an ALJ, including counseling and other discipline, are documented in the ALJ's 7(b) file, *see id.* ¶ 19, ***GRANTING*** SSA's requests to strike those paragraphs on the basis that they are unsupported by the citations given, *see* Defendant's Reply SMF ¶¶ 15, 17, 19.

Evans had joined the Portland Hearing Office as an ALJ in 2010 and occasionally served as acting HOCALJ in Fletcher's absence. Defendant's SMF ¶ 63; Plaintiff's Opposing SMF ¶ 63. After she joined the Portland Hearing Office, it became apparent to her that Morgan frequently disregarded ODAR's policies regarding time and attendance. *Id*. ¶ 64. She observed that Morgan came and went as she pleased and was frequently absent for long periods during the day. *Id*. Evans was told that Morgan had previously sued SSA for discrimination and won a large settlement and, as a result, was essentially "untouchable." *Id*. ¶ 65. Morgan's disregard for the office's time and attendance policies was a frequent topic of discussion within the office. *Id*. ¶ 66.

On several occasions when Evans was the acting HOCALJ, Franklin reported her concerns about Morgan's time and attendance to her and indicated that she did not feel comfortable certifying Morgan's time sheets because she did not believe they were accurate. *Id*. ¶ 68. Evans was also skeptical that Morgan truly worked a full eight-hour day when she was working from home on Flexiplace. *Id*. ¶ 69.

In early June 2014, ODAR established a virtual private network ("VPN") to allow employees working from home to connect to the ODAR network, just as if they were working at their desktop computers in the office. *Id*. ¶ 70. The Microsoft Office Outlook suite used by SSA enables users to see the "status" of other users working online. *Id*. ¶ 71. Users can see, for example, whether someone is "available" or "busy" or "away" from his or her computer and for how long someone has been "offline" from the network. *Id*. After ODAR installed VPN capability on all of the ALJs' laptops, ALJs teleworking from home connected to the network to access their case files. *Id*. ¶ 72.

On Friday, June 6, 2014, and again on Monday, June 9, 2014, Evans was aware that Morgan was supposed to be teleworking from home. *Id*. ¶ 73. Evans periodically checked on Morgan's

status throughout the day on each of her telework days and discovered that she was essentially "away" or "offline" the entirety of both days.  *Id.*  Evans' observations heightened her suspicions regarding Morgan's abuse of ODAR's Flexiplace policy.  *Id.* ¶ 74.  She shared her observations with Korupp, as well.  *Id.*

While Evans was acting HOCALJ in July 2014, Korupp told her that Morgan had taken an extended lunch on July 28, 2014, and then claimed an hour of "credit" time when she signed out at her regular time at the end of the day.  Defendant's SMF ¶ 75; Declaration of Vickie G. Evans (ECF No. 75) ¶ 19.  Korupp did not believe that Morgan was entitled to an hour of credit time, and brought the matter to Evans' attention as acting HOCALJ.  *Id.*[30]  On July 29, 2014, Evans and Korupp emailed Fletcher expressing their concerns about Morgan's time and attendance the prior day.  Stipulations ¶ 126.  They described Korupp's observations:

> [Morgan] signed in at 6:30 a.m.  I witnessed her departure for lunch at 1:25 p.m. and was concerned because her tour was to end at 3:00 pm (lunch within 2 hours of the [end] of the day).  At 2:30 pm her door was shut and the instant messenger reflected that she had been offline for over an hour.
>
> As I was speaking to Maureen [Schofield] in her office, I witnessed the Judge returning from lunch at about 3:05 pm.  Judge Evans noticed that at 3:23 pm the messaging system reflected that she had been offline for two hours.  She was not available online until 3:35 pm and by 3:50 pm, although she was online, she had been inactive for [the] previous 5 minutes.  Judge Evans noted that [at] 4:01 pm, she was offline for 5 minutes.  She signed out at 4:00 pm which coincides with logging off the system at 3:56 pm.
>
> She indicated on the sign in/out sheet that she worked 1 hour of credit; there is no explanation for the extended lunch.
>
> We feel the situation warrants attention sooner than your return to the office allows. Judge Sax will be in our office tomorrow (Wednesday), do you agree she should address the situation then or do you wish to handle it when you return?

---

[30] Morgan's request to strike paragraph 75 on the ground that it constitutes inadmissible hearsay, *see* Plaintiff's Opposing SMF ¶ 75, is **_DENIED_**.  The statement is offered not for the truth of Korupp's report to Evans, but for the fact of the report.  *See* Defendant's Strike Responses ¶ 75; Fed. R. Evid. 801(c); *United States v. Bailey*, 270 F.3d 83, 87 (1st Cir. 2001) (a statement "offered to show the effect of the words spoken on the listener (e.g., to supply a motive for the listener's action)" is not hearsay) (citation and internal quotation marks omitted).

*Id.* ¶ 127.

Sax and Malvey subsequently instructed Fletcher to address the matters directly with Morgan when he returned to the office.  *Id.* ¶ 128.

On August 6, 2014, Fletcher emailed Morgan and told her that he wanted to meet with her the following week "in regard to time and attendance issues relating to Monday and Tuesday of last week."  *Id.* ¶ 134.  In his email, he initially identified the wrong dates in question (as August 4 and 5 rather than July 28 and 29).  *Id.*  He noted in his email that Morgan had the right to have a union representative present.  *Id.*

Morgan responded later that day, indicating that she would not be available on the date he had proposed for the meeting and questioning the dates he had identified in his email.  *Id.* ¶ 135. Morgan also wrote: "If you have something to charge me with I would like it in writing.  I consider this a continuation of the hostile environment, continuing harassment and retaliation against me." *Id.*  In an email to Morgan's union representative, Judge Peter Martinelli, the following day, August 7, 2014, Fletcher clarified the dates in question and spelled out his concerns.  *Id.* ¶ 136. He noted: "My initial e-mail to Judge Morgan cited the wrong dates.  My concern involves July 28 and 29, lunch breaks well in excess of one hour, and a claim for credit hours without accounting for the extra time taken at lunch."  *Id.*

On August 11, 2014, Fletcher announced that he would be stepping down as HOCALJ in the Portland Hearing Office and relocating to Arizona to serve as a line ALJ in the Phoenix Hearing Office.  *Id.* ¶ 137.  Before meeting with Morgan on August 14, 2014, Fletcher prepared a one-page memo detailing the bases for his concerns and provided it to her.  *Id.* ¶ 138.  He wrote:

Monday, July 28

You signed in at 6:30 (so the workday would end at 3:00)

28

> Stephanie [Korupp] witnessed your departure for lunch at 1:25.  She saw you return at 3:05.  This [is] consistent with the observations of Judge Evans, who was serving as acting HOCALJ.
>
> You signed out at 4:00 and claimed an hour of credit.
>
> Tuesday, July 29
>
> You signed in at 7:00, so the basic workday would end at 3:30
>
> Mary [Franklin] saw you leaving the office at 1:20 PM
>
> You were seen by Judge Evans re-entering the office at 3:03.
>
> You signed out at 4:30 and claimed an hour of credit.
>
> In both cases, you were gone in excess of one hour, and made no effort to account for your time.

*Id.* ¶ 139.  On August 14, 2014, Fletcher met with Morgan to discuss the time and attendance concerns that had been raised by Korupp and Evans.  *Id.* ¶ 140.  This was a "Weingarten" meeting. Plaintiff's Additional SMF ¶ 57; Fletcher Dep. Exh. 4 (ECF No. 49-19), Exh. G-1 to Stip. Rec., at Page ID ## 979-81.[31]  Martinelli participated by phone.  Stipulations ¶ 140.  During that meeting, Morgan denied that she had taken a long lunch on the days in question.  *Id.*  She refused to amend her sign-in sheets or take leave for the periods in question.  *Id.*  Morgan and Martinelli threatened to file a grievance with the union if management took any disciplinary action against Morgan.  *Id.*

On Friday, September 12, 2014, Fletcher spoke with Malvey about how to address Morgan's time and attendance issues on July 28 and 29, 2014.  *Id.* ¶ 147.  Fletcher emailed Malvey the following Sunday, September 14, with two possible responses to Morgan.  *Id.*  On Friday,

---

[31] I omit Morgan's characterization of Fletcher as having "subjected" her to a Weingarten investigation, *see* Plaintiff's Additional SMF ¶ 57, ***GRANTING*** SSA's request to strike that characterization on the bases that it is unsupported by the citation given and constitutes argument of counsel, *see* Defendant's Reply SMF ¶ 57.

September 19, Malvey responded and forwarded a draft response to Morgan that he had prepared.

*Id*.

At 3:16 p.m. on October 10, 2014, Fletcher's last day as HOCALJ in the Portland Hearing

Office, he emailed Morgan regarding the unresolved time and attendance issues from July. *Id*.

¶ 148.  He attached a copy of a memo that Korupp had circulated on September 12, 2014,

reminding all employees of ODAR's time and attendance policies. *Id*.  He wrote:

> Katherine,
>
> I wanted to wrap up a lose [sic] end.
>
> After careful consideration, I conclude that you took a long lunch break from approximately 1:30 p.m. to 3:00 p.m. on July 28th and July 29th.  Additionally, there was a problem in that your lunch breaks extended to within two hours of the end of your work day.
>
> I am not pursuing any discipline in this matter, but would remind you that leave violations can result in you being marked Absent Without Leave (AWOL) and/or subject to disciplinary action.  This office permits employees to take one hour for lunch, but the lunch period may not be taken within the first two hours or the last two hours of an employee's 8 hour tour.  Likewise, a lunch break cannot be combined with a core time deviation absence within two (2) hours of the beginning or end of a Judge's workday.  Core time deviations must be recorded in the appropriate block on the Form SSA-30.  A judge must also account for the total number of hours he or she is scheduled to work each day.

*Id*. ¶ 149.

The layout of the Portland ODAR office made it possible to exit or enter without anyone

knowing.  Plaintiff's Additional SMF ¶ 47; Defendant's Reply SMF ¶ 47.  During the time period

when Fletcher was the chief judge of the Portland ODAR Hearing Office, Melanson "was routinely

going to the Bay Club" during his lunch break.  Plaintiff's Additional SMF ¶ 1; Fletcher Dep. at

Page ID ## 947-48.[32]  During the 2006-07 time frame, Melanson's trips to the Bay Club exceeded

---

[32] I **_DENY_** SSA's request to strike this paragraph on the basis that it is unsupported by the citation given.  *See* Defendant's Reply SMF ¶ 1.  In the alternative, SSA denies that this occurred throughout the pendency of Fletcher's

one hour.  Plaintiff's Additional SMF ¶ 2; Defendant's Reply SMF ¶ 2.  In response, during that time frame, Fletcher asked Melanson to "try to keep it close to an hour."  *Id.* ¶ 3.[33]  Fletcher did not report Melanson to the Boston Regional Office.  *Id.* ¶ 4.[34]  Fletcher called Malvey to discuss Morgan's routinely long lunches but did not call regarding Melanson.  *Id.* ¶ 5.[35]  Fletcher drafted a memorandum to Morgan regarding the length of her lunch breaks but did not draft a memorandum to Melanson regarding the length of his.  *Id.* ¶ 6.[36]

Malvey, testifying on behalf of SSA, stated that, while it was his understanding that there were no exceptions to the policy prohibiting combining leave and lunch, if an ALJ was nearing the end of a hearing day and wanted to continue on and take a later lunch in order not to inconvenience witnesses, claimants, or expert witnesses, "that would be a very good business reason for not enforcing the policy[,]" and if he were the supervisor in that situation, he would say, "yes, go ahead and take the late lunch."  Plaintiff's Additional SMF ¶ 32; Malvey Dep. at Page ID # 1128.[37]

---

tenure as HOCALJ, pointing out that Fletcher testified that this occurred from 2006 to 2007.  *See id.*; Fletcher Dep. at Page ID ## 947-48.

[33] My recitation of paragraphs 2 and 3 incorporates SSA's qualification as to the relevant time frame.  *See* Defendant's Reply SMF ¶¶ 2-3; Fletcher Dep. at Page ID ## 947-48.

[34] I omit Morgan's further assertion that Fletcher "reported" her to the Boston Regional Office, Plaintiff's Additional SMF ¶ 4, ***GRANTING*** SSA's request to strike on the basis that it constitutes argument of counsel rather than a fact, *see* Defendant's Reply SMF ¶ 4.

[35] I omit Morgan's further assertions that Fletcher called Malvey to discuss "disciplining Morgan" and did not call regarding Melanson's "similar conduct[,]" Plaintiff's Additional SMF ¶ 5, ***GRANTING*** SSA's request to strike on the basis that those statements constitute arguments of counsel rather than facts, *see* Defendant's Reply SMF ¶ 5.

[36] I omit Morgan's further assertion that Fletcher did not draft a "similar" memorandum to Melanson "regarding his routinely long lunches[,]" Plaintiff's Additional SMF ¶ 6, ***GRANTING*** SSA's request to strike on the basis that this assertion constitutes argument of counsel rather than a fact, *see* Defendant's Reply SMF ¶ 6.

[37] I ***GRANT*** SSA's request to strike paragraph 32 as originally worded as unsupported by the citation given, *see* Defendant's Reply SMF ¶ 32; however, I have reworded the paragraph to conform more closely to the underlying record citation and have incorporated SSA's qualification.  I omit Morgan's statements that (i) SSA employees would take lunch breaks within two hours of the end of the workday, (ii) during those lunch breaks, certain SSA employees would watch television in the Portland ODAR office lobby, (iii) on at least one occasion, Melanson summarily dismissed numerous cases so that he could leave early for the day, and (iv) SSA went to great lengths to enforce policies against Morgan even if it meant disrupting hearings, *see* Plaintiff's Additional SMF ¶¶ 42-43, 46, 59, ***GRANTING*** SSA's request to strike them on the bases that (i) Brown, whose declaration Morgan cites in support of paragraphs 42, 43, and 46, does not make clear how she has personal knowledge of the asserted facts, *see* Defendant's

### 2. Korupp's Three Complaints about Morgan in 2014 to OIG, SSA

#### a. Anonymous July 30, 2014, Complaint to OIG

On or about July 30, 2014, Korupp submitted an anonymous complaint to the OIG using the link on the OIG's website regarding what she perceived to be Morgan's continuing violations of the agency's time and attendance policies.  Stipulations ¶ 129.[38]  In her complaint, she wrote:

> All of ODAR was required to read the Senator Coburn report on Huntington _ WV and has been repetitively instructed to _ say something when you see something _. For approximately 10 years _ Agency executives have allowed Judge Katherine Morgan of the Portland _ Maine office to routinely abuse staff and managers _ flagrantly violate policies and expectations _ and complete fraudulent time and attendance records despite receiving reports of all of the these [sic] instances. Copious documents _ in executive level possession _ demonstrate that she consistently fails to complete 8 hours of work while asserting on time and attendance records that she has.  Upper management is and has been aware of her abuse yet does not take action out of either fear of losing productivity in an apparent effort to achieve agency goals _ or of her history of vindictive retaliation.  In July 2013 _ allegation Q13040689 was anonymously filed requesting an investigation of Judge Morgan_s misbehaviors and to date _ no action has been taken. . . .

*Id.*  The July 30, 2014, anonymous complaint was assigned an "allegation" number by the OIG and closed on the very same day as a "duplicate allegation."  *Id.* ¶ 130.  No one from the OIG ever followed up on the second complaint regarding Morgan's alleged failure to follow the agency's time and attendance policies.  *Id.*

---

Reply SMF ¶¶ 42-43, 46; Brown Decl.; *Navedo*, 848 F. Supp.2d at 179, and (ii) paragraph 59 constitutes argument of counsel rather than a fact, *see* Defendant's SMF ¶ 59.  As to paragraphs 42, 43, and 46, Morgan rejoins that Brown states that her declaration supplements her deposition testimony and a prior affidavit, *see* Plaintiff's Strike Responses ¶¶ 42-43, 46; however, Brown does not incorporate by reference specific passages of her prior affidavit or deposition testimony, *see* Brown Decl. ¶ 1.

[38] Korupp does not recall submitting this specific complaint to the OIG.  Stipulations ¶ 129 n.7.  However, for purposes of summary judgment, SSA accepts that she was the individual who did so.  *Id.*

### b.  Anonymous August 11, 2014, "See Something, Say Something" Complaint to SSA

On or about August 8, 2014, DQS concluded that Morgan's hostile work environment claim was unsubstantiated.  *Id*. ¶ 131.[39]  On Monday, August 11, 2014, Korupp submitted the following to the "See Something, Say Something" mailbox, using the link provided on ODAR's intranet page:

> Thank you for the recent addition to the "Huntington Model" presentation referencing ALJ behavior.  As executive-level managers within the component are aware, Judge Katherine Morgan of my hearing office, has a long-standing pattern of fraudulent, wasteful and abusive behavior.  To my knowledge, at least 2 OIG reports and one, recently found unsubstantiated, investigation of a hostile workplace have included consistent reports of her misbehaviors.  These reports have provided detailed and valuable information and documentation.  If you require additional information or documentation, however, please feel free to contact me.

*Id*. ¶ 132.  The ODAR staff monitoring the "See Something, Say Something" mailbox forwarded Korupp's complaint to the Boston Regional Office for follow-up.  *Id*. ¶ 133.  "See Something, Say Something" complaints are directed to the Chief Judge's office.  Plaintiff's Additional SMF ¶ 54; Defendant's Reply SMF ¶ 54.[40]  The Boston Regional Office did not initiate a new investigation into Morgan's compliance with the agency's time and attendance policies, and no one ever followed up with Korupp in response to her submission.  Stipulations ¶ 133.

### c.  Anonymous October 2014 Report to OIG of Healthcare Fraud

On the afternoon of October 1, 2014, Morgan was hit in the head by a door as she was attempting to locate her entry badge in her purse.  *Id*. ¶ 150.  As she was bending down in front of one of the office exits searching her bag, another ALJ happened to be leaving the office, and when

---

[39] I omit Morgan's statements that Korupp first became aware of Morgan's protected activity in May 2014 when she was interviewed in response to Morgan's charges of discrimination, *see* Plaintiff's Additional SMF ¶ 55, and that Korupp learned on August 8, 2014, that Morgan's allegations of a hostile work environment had been found to be unsubstantiated, *see id*. ¶ 56, **_GRANTING_** SSA's requests to strike them on the basis that they are unsupported by the citations given, *see* Defendant's Reply SMF ¶¶ 55-56.

[40] I **_GRANT_** SSA's request to strike Morgan's further assertion that such complaints "can trigger serious consequences[,]" Plaintiff's Additional SMF ¶ 54, on the basis that it is unsupported by the citation given, *see* Defendant's Reply SMF ¶ 54.

he opened the exit door, it struck her on the head.  *Id*.  Morgan left the office immediately after the injury and went to her internist's office for a CT-scan of her head, which was negative.  *Id*. ¶ 151. Fletcher permitted her to use administrative leave for the rest of the day of her injury.  *Id*.  She did not return to the office until the following Tuesday, October 7, 2014.  *Id*.

On Monday, October 6, 2014, Fletcher sent an urgent email to Morgan, on which Franklin and Korupp were copied, regarding her time for October 2 and 3.  *Id*. ¶ 152.  He wrote:

> Katherine,
>
> When closing out the payroll this afternoon, it was determined that we did not have a leave slip from you for last Thursday or Friday (October 2 and 3).  For that reason, you had to be listed as AWOL for those two days, which will affect your next pay check.
>
> We can go back and amend the payroll so that you can redeem any lost pay on the next pay check.  However, you do need to provide me with a leave slip for those two days indicating what kind of leave you are requesting.
>
> While on this topic, I also need a leave slip for Wednesday afternoon.  You can go ahead and ask for administrative leave for that day.  Because it was on the day of the injury, and I was aware of the fact you were leaving, I did not need to put you down as AWOL for that period, but I will need the leave slip.
>
> Guy

*Id*. ¶ 153.  When Morgan returned to the office on October 7, 2014, she submitted all of the requested leave slips.  *Id*. ¶ 154.  In addition, that day she completed an "Occupational Injury and Illness Report" and a U.S. Department of Labor "Notice of Traumatic Injury and Claim for Continuation of Pay/Compensation" form wherein she requested workers' compensation in the form of leave for the two days that she had missed the previous week.  *Id*. ¶ 155.  Her request was later granted, and she was given two days of leave based on the injury that she had sustained.  *Id*. She was paid for all of the time she took off as a result of the workplace injury she sustained on October 1, 2014, and did not have to use her own sick leave for that time.  *Id*. ¶ 156.

Shortly thereafter, Korupp submitted a complaint to the OIG using the link provided on its homepage. *Id.* ¶ 157. She wrote:

> On 10/7/14, Katherine Morgan, an employee of the Portland, ME ODAR office, filed a CA-1 with regard to an incident that occurred on 10/1/14. She asserts that she entered the office while another employee was departing, and the door bumped her in the head. Although the other employee confirmed this event, employee Morgan may have created the circumstance in an effort to receive continuation of pay benefits. Within the previous 6 months she has rapidly increased her leave use to the extent that she is now routinely requesting advance leave. In mid-September, the management team noted behaviors that, at the time, appeared unexplainable, i.e., she would place her garbage can immediately in front of her closed office door, and she would hide behind her[] nearly closed office door. We noted safety concerns related to the behaviors, and as examples, moved the garbage can out of traffic flow and approached her[] nearly closed office door with an abundance of caution. In retrospect, it appears the behaviors may have been an effort to injure herself at the workplace, either by falling over the garbage can or by getting bumped by a [sic] when someone opened it without knowing she was behind it.

*Id.*

The OIG referred Korupp's submission to the Boston Regional Office for follow-up. *Id.* ¶ 158. No one at the Boston Regional Office took any action with respect to her complaint, however. *Id.*[41] Korupp's statement that Morgan intended to injure herself at the workplace is baseless. Plaintiff's Additional SMF ¶ 60; Morgan Decl. ¶ 5.[42]

Morgan did not learn about Korupp's complaints until November 2015, and did so only through the course of discovery in her federal lawsuit. Defendant's SMF ¶ 128; Plaintiff's Opposing SMF ¶ 128.

---

[41] I **_GRANT_** SSA's request to strike Morgan's statement that Korupp has not filed any complaints or attempted to initiate investigations against other SSA employees, *see* Plaintiff's Additional SMF ¶ 44, on the basis that it is unsupported by the citation given, *see* Defendant's Reply SMF ¶ 44.

[42] I **_DENY_** SSA's request to strike this statement on the basis that it constitutes improper and self-serving opinion testimony and is in the nature of an argument rather than a fact. *See* Defendant's Reply SMF ¶ 60. That Morgan denies Korupp's statement is a fact. SSA alternatively denies the statement, *see id.*; however, I view the evidence in the light most favorable to Morgan as nonmovant.

At no time was Morgan ever subjected to any discipline as a result of her behavior. Defendant's SMF ¶ 98; Fletcher Decl. ¶ 39.[43]  In fact, to the contrary, Morgan's compensation actually increased each year.  Defendant's SMF ¶ 99; Plaintiff's Opposing SMF ¶ 99.  Between January 2010 and January 2015, her adjusted basic pay increased from $164,048 to $167,359.  *Id*. As of June 27, 2016, her adjusted basic pay was $170,400.  *Id*.

### III.  Discussion

Morgan opposes SSA's motion for summary judgment as to her retaliation claim because, she argues, following her December 11, 2013, complaint to Sax and Fletcher that her supervisors had discriminated against her, those supervisors sought to drive her from the workplace by falsely and improperly informing her that she was the subject of a career-ending investigation, attempting to have her investigated without cause, singling her out for disparate treatment of workplace policies, and generally endeavoring to make her work life miserable.  *See* Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Opposition") (ECF No. 89) at 3; Amended Complaint ¶¶ 25-45.

Morgan invokes 42 U.S.C. § 2000e-3(a), *see* Amended Complaint at 4, a provision of Title VII of the Civil Rights of 1964 Act ("Title VII") that "prohibit[s] employers from "retaliating against persons who complain about unlawfully discriminatory employment practices[,]" *Xiaoyan Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 218 (1st Cir. 2016) (citation and internal punctuation omitted).  To demonstrate retaliation, "a plaintiff must show that (i) she undertook protected

---

[43] I ***GRANT*** in part Morgan's request to strike this statement, omitting the phrase "adverse employment action" on the basis that it constitutes a legal conclusion, *see* Plaintiff's Opposing SMF ¶ 98, and otherwise ***DENY*** it.  Morgan alternatively denies the statement, *see id.*; however, her denial is not supported by the citation given.  I omit Morgan's statement that, prior to her protected activity, she was never counseled or formally disciplined regarding time and attendance issues, *see* Plaintiff's Additional SMF ¶ 24, ***GRANTING*** SSA's request to strike on the basis that the statement is unsupported by the citation given, *see* Defendant's Reply SMF ¶ 24.

conduct, (ii) she suffered an adverse employment action, and (iii) the two were causally linked." *Id.* at 218-19 (citation and internal quotation marks omitted).

"An employee who carries her burden of coming forward with evidence establishing a prima facie case of retaliation creates a presumption of discrimination, shifting the burden to the employer to articulate a legitimate, non-discriminatory reason for the challenged actions." *Id.* at 219 (citation and internal punctuation omitted). "Should the employer create a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff carries the burden of showing that the employer's reason for the adverse action was pretextual." *Id.* (citation and internal quotation marks omitted).

SSA does not dispute that Morgan engaged in protected conduct sufficient to satisfy the first element of her *prima facie* case; namely, that, (i) on December 11, 2013, she informed Sax that Melanson and Edwards were hostile toward older women and had subjected her to harassment, (ii) the following day, she emailed Fletcher, alleging that she had been "singled out for abuse" by her male colleagues based on her age and gender, (iii) on January 10, 2014, she emailed Sax and again asserted that she had been subjected to a hostile work environment, (iv) on March 26, 2014, she requested pre-complaint counseling with an EEO counselor regarding her claim of workplace discrimination, (v) on May 2, 2014, she filed a formal EEO complaint alleging discrimination based on age, gender, and retaliation for protected activity, (vi) on August 6, 2014, she informed Fletcher that she believed his questioning of her time and attendance constituted a continuation of a hostile work environment, harassment, and retaliation, and (vii) on August 18, 2014, she emailed Fletcher and accused him of creating a hostile environment and of harassment based on age, gender, parental status, and retaliation.  Motion at 23-24 & n.9.

However, SSA argues that Morgan's case founders on her failure to show that any of the actions at issue constituted adverse employment actions.  *See id.* at 24-29; Defendant's Reply Brief in Support of Motion for Summary Judgment ("Reply") (ECF No. 95) at 2-10.  In the alternative, it contends that Morgan fails to demonstrate the requisite causal link between her protected activity and the actions of which she complains for purposes of either her *prima facie* case or subsequent burden-shifting analysis.  *See* Reply at 10-15.  For the reasons that follow, I agree that Morgan fails to meet her burden of demonstrating that she was subjected to an adverse employment action. This is dispositive of her retaliation claim, warranting summary judgment in SSA's favor.

As the First Circuit has noted, for purposes of a claim of retaliation:

Material adverse actions are actions that are harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.  However, petty slights or minor annoyances that often take place at work and that all employees experience are not material adverse actions and consequently, fall outside the scope of the anti-discrimination laws.  Title VII does not set forth a general civility code for the American workplace.

*Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 176 (1st Cir. 2015) (citations and internal punctuation omitted).  "This is an objective test and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."  *Lockridge v. University of Me. Sys.*, 597 F.3d 464, 472 (1st Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006)).

The First Circuit has observed that "[a]fter *Burlington Northern*, employment actions are less susceptible to categorical treatment when it comes to the question of whether they are or are not materially adverse."  *Id*.  For example, "under certain circumstances, the denial of an employee's request for office space could dissuade a reasonable person from making or supporting a charge of discrimination[,]" although not in circumstances in which "[t]he attendant inconveniences may not have been optimal, but neither did they affect [the plaintiff] more

adversely than they did some of her colleagues." *Id*. at 472-73.  Additional "[e]xamples of adverse employment actions in the retaliation context include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Morales-Vallellanes v. Potter*, 605 F.3d 27, 36 (1st Cir. 2010) (citation and internal quotation marks omitted).  "In the absence of a finding that the plaintiff has suffered adverse action, a retaliation claim fails as a matter of law." *Id*. (citation and internal quotation marks omitted).

Morgan argues that SSA took actions that, individually or collectively, were materially adverse when (i) Sax falsely and improperly informed her that she was the subject of an OIG investigation, (ii) Korupp repeatedly reported her to the OIG, and (iii) SSA supervisors and employees selectively enforced sick leave and lunch break policies against her and monitored her activities in a "Kafkaesque" manner.  *See* Opposition at 4-14.[44]

SSA rejoins that none of those actions resulted in the type of significant harm necessary to establish a legally cognizable claim of retaliation under Title VII and that the court can consider the cumulative effects of such actions only in the context of a hostile work environment claim, which Morgan abandoned.  *See* Reply at 2-3 & n.4.  In the alternative, it argues that the listed actions, collectively, fail to demonstrate the existence of a retaliatory hostile work environment. *See id*. at 3 n.4.  I agree that, even viewing the cognizable evidence in the light most favorable to Morgan, her claim founders on this prong.

---

[44] "Kafkaesque" is defined as "[o]f or typical of Franz Kafka or his writings" and "[m]arked by surreal distortion and usu[ally] by a sense of impending danger[.]"  Webster's II New Riverside Univ. Dictionary 660 (1994).

## A. Sax's Report of Existence of OIG Investigation

Morgan contends that, given the potential consequences of an OIG investigation, the mere act of informing an employee that she is the subject of such an investigation constitutes a materially adverse action, regardless of whether the employee is formally disciplined as a result. *See* Opposition at 7. She cites *O'Neal v. State Univ. of N.Y.*, Civil Action No. CV-01-7802 (DGT), 2006 WL 3246935, at *13 (E.D.N.Y. Nov. 8, 2006), for the proposition that a letter notifying a plaintiff-employee of an investigation that did not result in formal discipline satisfied the "materially adverse" standard, and *Rattigan v. Holder*, 604 F. Supp.2d 33, 52 (D.D.C. 2009), for the proposition that whether an investigation's effects are felt in the present is irrelevant to whether it would dissuade a reasonable worker from making charges of discrimination. *See id.*

Nonetheless, as SSA points out, *see* Reply at 4-5, the United States District Court for the District of Columbia rejected a claim that an OIG investigation constituted a materially adverse employment action when no evidence buttressed the plaintiff-employee's allegations that (i) her reputation had suffered as a result, (ii) OIG investigations generally "cast a shadow" on her agency's employees, (iii) her co-workers knew of the investigation, or (iv) it had any effect on the terms or conditions of her employment, *see Brown v. Mills*, 674 F. Supp.2d 182, 191-92 (D.D.C. 2009).

Morgan likewise identifies neither reputational harm nor any impact on the terms or conditions of her employment as a result of the OIG investigation at issue.[45] Indeed, she does not claim that the investigation itself was a retaliatory act but, rather, Sax's allegedly deliberately false

---

[45] Morgan included, in her statement of additional facts, an assertion that allegations that trigger an OIG investigation, even if found unsubstantiated, can destroy an ALJ's reputation and negatively impact his or her career. *See* Plaintiff's Additional SMF ¶ 45. As discussed above, I omitted that statement, granting SSA's request to strike it on the basis that it was unsupported by the citation given. *See* Defendant's Reply SMF ¶ 45.

report to her of its existence.  *See* Opposition at 7-8.  As SSA argues, *see* Reply at 4, it is difficult to see how telling an employee about an OIG investigation could constitute a materially adverse action when the underlying investigation itself does not.  That is particularly so in these circumstances: Morgan herself had asked Sax point-blank whether she was the subject of an OIG investigation.  *See* Stipulations ¶ 58.

To the extent that Morgan relies in part on the alleged deliberate falsity of the disclosure, *see* Opposition at 7, I have determined, as discussed above, that she failed to controvert SSA's statement that Sax did not know until February 2015 that the OIG investigation had concluded, *see* Defendant's SMF ¶ 123.  Hence, the only evidence in the record is that Sax told Morgan what she believed at the time to be true.  In any event, deliberate falsity, standing alone, would not establish that the disclosure was materially adverse: the proper analysis centers on the impact of the action on a reasonable employee in the plaintiff-employee's shoes.  *See, e.g., Planadeball*, 793 F.3d at 176.  The mere fact that the disclosure was improper – that is, made against the advice of Malvey and the Chief Judge's Office predicated on the ALJ contract, *see* Stipulations ¶ 60; Plaintiff's Additional SMF ¶ 39; Defendant's Reply SMF ¶ 39; Plaintiff's Additional SMF ¶ 41; Sax Dep. at Page ID # 1193 – does not suffice to render it materially adverse for the same reason.

The disclosure, hence, is not actionable as a matter of law.  *See, e.g., Bhatti v. Trustees of Boston Univ.*, 659 F.3d 64, 73 (1st Cir. 2011) ("We have found before that a reprimand may constitute an adverse action, but the reprimands at issue here are tamer beasts . . . .  Specifically, none of the reprimands here can be said to be material because none carried with it any tangible consequences. . . .  Bhatti may well be right that these reprimands were undeserved – indeed, she presents enough evidence that we may safely presume her to be blameless (or nearly so) in each

instance for summary judgment purposes – but a criticism that carries with it no consequences is not materially adverse and therefore not actionable.") (citation omitted).

As SSA argues, *see* Reply at 7 n.6, *O'Neal* and *Rattigan* are distinguishable.  The letter at issue in *O'Neal* informed the plaintiff-employee "that she had to submit to a disciplinary interview and that she was the subject of a disciplinary investigation."  *O'Neal*, 2006 WL 3246935, at *13. The court, accordingly, concluded that "the prospect of O'Neal being disciplined was then imminent."  *Id.*  In this case, by contrast, there is no evidence that Sax indicated that the prospect of discipline was imminent or that any particular step was about to be taken.

The *Rattigan* court recognized that, "[o]f course, plaintiff's purely *subjective* perception that the Leighton EC [Electronic Communication] and resulting security investigation jeopardized his 'career goals' does not make defendant's actions materially adverse."  *Rattigan*, 604 F. Supp.2d at 54 (citations omitted) (emphasis in original).  It noted, "Rather, plaintiff must produce evidence that the security investigation posed an *objective* harm to his reputation or prospects."  *Id.* (citations omitted) (emphasis in original).  Yet, whereas the employee in *Rattigan* produced such evidence in the form of the testimony of at least three witnesses, including the individual who conducted the security investigation, that such an investigation could derail an FBI agent's career, *see id.* at 54-55, Morgan offers no such cognizable evidence.

Sax's disclosure to Morgan of the existence of the OIG investigation, hence, did not constitute an adverse employment action for purposes of her retaliation claim.

## B.  Korupp's Complaints to OIG About Morgan

Morgan next points to Korupp's reports to the OIG in July, August, and October 2014, citing *O'Neal*, 2006 WL 3246935, at *9, and *Doucet v. University of Cincinnati*, No. 1:05CV148, 2006 WL 2044955, at *22 (S.D. Ohio July 19, 2006), *aff'd*, No. 06-4118, 2007 WL 2445993 (6th Cir. Aug. 28, 2007), for the proposition that the initiation of a formal or serious disciplinary review

constitutes a materially adverse employment action even if it does not result in discipline.  *See* Opposition at 8.  She asserts that the fact that she learned of Korupp's complaints only through discovery in this case is immaterial, citing *Burlington Northern* for the proposition that the determination of whether an action is materially adverse is made by examining whether it holds a prospect of harm, not by whether the harm comes to pass or its effect are felt in the present.  *See id.* at 9.

By contrast, SSA contends that the fact that Morgan was unaware of those complaints until she learned of them through discovery, at which time it was clear that OIG had taken no action in response to them, is dispositive.  *See* Motion at 27-28; Reply at 7-8; Defendant's SMF ¶ 128; Plaintiff's Opposing SMF ¶ 128; Stipulations ¶¶ 130, 158.  SSA has the better argument.

As *Burlington Northern* makes clear, the circumstances in which a plaintiff-employee is subjected to alleged retaliatory action are relevant to whether, as an objective matter, a reasonable employee in her shoes would be deterred from protected activity: "Whether a particular [action] is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of *a reasonable person in the plaintiff's position, considering all the circumstances*."  *Burlington Northern*, 548 U.S. at 71 (citation and internal quotation marks omitted) (emphasis added).  In this case, those circumstances include the fact that, when Morgan learned of Korupp's complaints, it was reasonably apparent that the OIG had chosen to take no action in response to them.

A reasonable employee in Morgan's shoes would not have been dissuaded from making or supporting a charge of discrimination by learning simultaneously that complaints had been made to the OIG but that no action had been taken as a result.  *See, e.g, Benuzzi v. Board of Educ. of City of Chicago*, 647 F.3d 652, 665 (7th Cir. 2011) (school principal's request to have plaintiff-

43

employee removed from school did not constitute a materially adverse action for purposes of retaliation claim when plaintiff-employee "was never in fact removed or demoted, even temporarily; an empty threat that quickly dissipates before the employee becomes aware of it does not constitute a materially adverse action"); *Valles-Hall v. Center for Nonprofit Advancement*, 481 F. Supp.2d 118, 155 (D.D.C. 2007) (lockout of plaintiff-employee from defendant-employer's offices and denial of her remote access to its computer system and voicemail was not a materially adverse action for purposes of her retaliation claim when she did not learn of those actions until after she had resigned; "As Plaintiff appears to have been entirely unaware of the lockout, she cannot claim that she suffered an injury or harm as a result, and therefore cannot demonstrate a materially adverse action on the part of [her employer]."); *see also, e.g.*, *Burlington Northern*, 548 U.S. at 67 ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").

*O'Neal* and *Doucet* – the other two cases on which Morgan relies – do not suggest otherwise. Those cases are materially distinguishable in that, at the time the plaintiff-employees were notified of the initiation of formal disciplinary investigations against them, the prospect of harm remained quite real. *See O'Neal*, 2006 WL 3246935, at *13; *Doucet*, 2006 WL 2044955, at *12. Indeed, in *O'Neal*, the court underscored that the notification letter itself constituted a materially adverse action, regardless of whether the investigation resulted in formal discipline, when (i) "the serious and formal nature of the disciplinary interview" was apparent from the face of the notification given that the defendant-employer invited the plaintiff-employee to bring a union representative or attorney, and (ii) "the prospect of O'Neal being disciplined was then imminent." *O'Neal*, 2006 WL 3246935, at *13.

In the circumstances of this case, as a matter of law, the Korupp reports do not constitute materially adverse actions for purposes of Morgan's Title VII retaliation claim.

### C.  Selective Enforcement of Policies

Morgan concedes that merely enforcing rules does not amount to an adverse employment action; however, she asserts that the incidents of which she complains qualify as such because she was subject to excessive and disparate policy enforcement and monitoring.  *See* Opposition at 13-14.

As SSA points out, *see* Reply at 8, courts "are near unanimous in concluding that close scrutiny, monitoring, or tracking of an employee's whereabouts – without more – simply does not rise to the level of a materially adverse retaliatory action[,]" *Aldrich v. Burwell*, __ F. Supp.3d _, Civil Action No. 15-1662 (JEB), 2016 WL 3919823, at *6 (D.D.C. July 18, 2016).  The reason, as the *Aldrich* court explained, is that:

> Simply stated, putting in a full day's work is a standard condition of employment. An employer's <u>monitoring</u> of an employee's time and attendance, therefore, is a basic employment practice, and as such could only be an adverse employment action if plaintiff previously had immunity from general employment policies.  In other words, closely monitoring an employee's attendance does not produce an injury or harm, as employers may reasonably require consistent, complete attendance and take reasonable steps to ensure an employee is not falling short.

*Id*. (citations and internal punctuation omitted) (emphasis in original).  The *Aldrich* court observed:

> The few cases to have gone the other way share one of two common attributes.  The first is the conclusion that where monitoring is not uniformly applied across the workforce, the <u>disparateness</u> of such monitoring may elevate otherwise innocuous attendance tracking to a materially adverse action. . . .

> The second common characteristic of cases in which close monitoring might be materially adverse is where the monitoring is so extreme and intrusive as to constitute harassment in its own right.

*Id.* at *7 (citations omitted) (emphasis in original).[46]  Morgan fails to generate a triable issue that either exception applies.

### 1.  Disparate Enforcement

#### a.  Sick Leave

Morgan first alleges that, when she and Shortill both missed a July 16, 2014, mandatory training session for medical reasons, Fletcher took no action due to Shortill's absence and yet "mobilized the formal disciplinary process" as to her, reporting her to the Boston Regional Office, which initially agreed that a Weingarten investigation should proceed but later advised against one because Shortill's parallel absence would create an "appearance" of unfair treatment.  Opposition at 10-11 (citing Plaintiff's Additional SMF ¶¶ 12-14).

As discussed above, these characterizations are unsupported by the citations given, which reflect that Fletcher consulted Malvey of the Boston Regional Office for advice on how to resolve the issue, and Malvey responded that he and the DQS agreed that a Weingarten hearing "may be needed."  Fletcher Dep. Exh. 13 at Page ID ## 997, 1002.  There is no evidence that Morgan ever was notified that a Weingarten hearing might be held, that any such hearing was in fact held, or that Morgan was disciplined in any manner as a result of her last-minute absence from the training. Ultimately, Fletcher approved her requested medical leave.  *See* Stipulations ¶ 124.

In any event, Morgan fails to show that she and Shortill were similarly situated, either in terms of historical time and attendance policy compliance or the incident at issue.  *See Deshpande*

---

[46] The *Aldrich* court declined to adopt the first exception, explaining: "The problem with this reasoning . . . – and why this Court chooses not to follow it here – is that although selective enforcement of employment policies may be evidence of <u>pretext</u>, such selective enforcement does not <u>alone</u> convert enforcement of a general policy of employment into adverse employment action.  In other words, even if the employer's scrutiny of plaintiff's attendance differed from the scrutiny given to his colleagues, such scrutiny does not, without more, constitute an adverse employment action, as it does not produce an injury or harm.  A petty slight is still a petty slight, even if that slight is disparately applied."  *Aldrich*, 2016 WL 3919823, at *7 (citations and internal punctuation omitted) (emphasis in original).  As SSA has not made this argument, *see* Reply at 8-9, I have not considered it.

*v. Medisys Health Network, Inc*., No. 07-CV-375 (NGG) (VVP), 2008 WL 2004160, at *5 (E.D.N.Y. May 7, 2008), *aff'd*, 423 Fed. Appx. 31 (2d Cir. 2011) (allegations in plaintiff physician's complaint sufficed to survive motion to dismiss when he alleged, in connection with Title VII retaliation claim, that "the monitoring to which Defendants have subjected him and the one-year rather than two-year renewal of his privileges were selectively applied only to him and not to other *similarly situated* physicians") (emphasis added).

There is no dispute that Morgan had time and attendance compliance issues dating to as early as 2011.  *See, e.g.,* Defendant's SMF ¶ 1; Plaintiff's Opposing SMF ¶ 1.  Yet, there is no evidence that Shortill had any such history.  There is no dispute that Morgan apprised Fletcher two hours before the mandatory training that she could not attend because she had scheduled some unanticipated medical tests.  Stipulations ¶ 122.  Shortill informed Fletcher of his conflicting medical appointment well in advance of the training.  Defendant's Reply SMF ¶ 10; Fletcher Dep. at Page ID # 955; Fletcher Dep. Exh. 13 at Page ID # 995.

No reasonable trier of fact could conclude that, in handling the Morgan and Shortill requests for medical leave in the way that he did, Fletcher selectively enforced time and attendance policies in a manner rising to the level of a materially adverse action against Morgan.

### b.  Lunch Breaks

Morgan next complains that lunch break policies were selectively enforced against her both as to the one-hour limit on such breaks and as to the ban against taking such breaks within two hours of the end of a workday.  *See* Opposition at 11-13.  On the first point, she asserts that, although she, like other judges, would occasionally take lunch breaks that lasted longer than the officially-permitted single hour, Fletcher addressed this practice only once prior to December 2013, telling her colleague Melanson, who reportedly took long lunches to work out at the Bay

Club, to "try to keep it close to an hour." *Id*. at 11-12 (quoting Plaintiff's Additional SMF ¶ 3). Yet, she contends that after she engaged in protected activity in December 2013, Fletcher began to enforce the one-hour rule aggressively against her, repeatedly drafting official memoranda and emails to her, reporting her to Malvey, and eventually conducting a Weingarten investigation for the same conduct that had merited only an informal warning to Melanson. *See id*. at 12. She argues that the disparate use of official discipline against her, *versus* the treatment of Melanson for the same conduct, would dissuade a reasonable worker from making a charge of discrimination. *See id*.

Nonetheless, Morgan fails to show that she was similarly situated to Melanson. As discussed above, I granted SSA's request to strike her statements that Fletcher (i) "reported" her to the Boston Regional Office, *see* Plaintiff's Additional SMF ¶ 4, (ii) called Malvey to discuss "disciplining Morgan" but did not call regarding Melanson's "similar conduct," *id*. ¶ 5, and (iii) did not draft a "similar" memorandum to Melanson "regarding his routinely long lunches[,]" *id*. ¶ 6, on the basis that they constituted arguments of counsel rather than fact. Morgan adduces no evidence that Melanson's lunch breaks were of comparable length to hers or that Melanson inaccurately reported them on his timesheets. She omits the fact, set forth by SSA in a qualification, that Melanson's conduct occurred in 2006-07, well prior to the period at issue here. *See* Defendant's Reply SMF ¶¶ 1-3; Fletcher Dep. at Page ID ## 947-48. While Melanson was not subjected to disciplinary action for transgressing the policy, ultimately neither was she. *See* Stipulations ¶ 149.

As to SSA's purported selective enforcement of the policy barring the taking of a lunch break within two hours of the end of a workday, Morgan does not argue that any particular individual was treated more favorably than her. *See* Opposition at 12. Rather, she contends

48

generally that, although the policy had not been enforced prior to her protected activity, Fletcher and Korupp repeatedly singled her out for enforcement thereafter, refusing to grant her requests to take a late lunch so that she could finish hearings while "permitting others to bend the rules." *Id.* This does not suffice to demonstrate that SSA treated others who were *similarly situated* more favorably in enforcing this policy. *See Deshpande*, 2008 WL 2004160, at *5. In any event, as discussed above, I have granted in whole or in part, on various grounds, SSA's requests to strike all of the statements of additional facts on which Morgan relies in making this argument. *See* Opposition at 12 (citing Plaintiff's Additional SMF ¶¶ 31-32, 42, 57, and 59).

### 2. "Kafkaesque" Monitoring

Morgan finally contends that, in addition to selectively enforcing policies against her, SSA supervisors and employees took drastic steps to ensure that she was following them to the letter, going so far as to monitor her online messenger system for activity, document her alleged malfeasance to the minute and report it to the Boston Regional Office, plant an investigator in the office adjoining hers, and keep unofficial personnel files on her. *See* Opposition at 13. She asserts that no other ALJ was monitored at all, much less in the Kafkaesque manner in which she was. *See id.*

The cognizable evidence, viewed in the light most favorable to Morgan, falls short of demonstrating that she was subjected to the type of "extreme supervision" that courts have concluded might constitute a materially adverse employment action, such as the use of "hidden surveillance cameras and tails[,]" the detailing of another employee to follow a plaintiff-employee and confirm his whereabouts during the day, and the placement of a plaintiff-employee under "constant surveillance." *Aldrich*, 2016 WL 3919823, at *7.

Morgan relies on Stipulations ¶¶ 43 and 127, Defendant's SMF ¶¶ 70 through 75, and Plaintiff's Additional SMF ¶ 58, *see* Opposition at 13, which reflect that:

1.      Malvey asked Schofield, whose office was next door to that of Morgan, to conduct the investigation undertaken in response to Edwards' complaint, including obtaining and reviewing timesheets, following which Schofield stated that she noticed "some discrepancies [in the timesheets], but nothing egregious[,]" Stipulations ¶ 43; Plaintiff's Additional SMF ¶ 58; Exh. A to Donahue Decl.;

2.      Using software installed by ODAR, Evans periodically monitored Morgan's online activity on June 6 and 9, 2014, when she was aware that Morgan was supposed to be teleworking from home, and shared her concerns about her observations with Korupp, *see* Defendant's SMF ¶¶ 70-74; and

3.      Korupp informed Evans, who was serving at the time as acting HOCALJ, that Morgan had taken an extended lunch on July 28, 2014, and then claimed an hour of "credit" time when she signed out at the end of the day, *see id.* ¶ 75, and Evans and Korupp emailed Fletcher the following day to report concerns arising from their observations of Morgan's comings and goings and Evans' monitoring of Morgan's online activity on July 28, 2014, *see* Stipulations ¶¶ 126-27.

Morgan points to no evidence that SSA kept an unofficial personnel file on her.  *See* Opposition at 13.

The parties stipulate that the period from approximately July 2013 through August 2014 is the relevant time period in this case.  *See* Stipulations ¶ 2.  Even assuming *arguendo* that Schofield's investigation, which predated Morgan's protected activity and was not undertaken at the behest of her supervisors but, rather, in response to an anonymous OIG complaint, constitutes

"supervision," the level of monitoring to which Morgan points over that more than yearlong period does not, as a matter of law, qualify as a materially adverse employment action. *See, e.g.*, *Aldrich*, 2016 WL 3919823, at *7 (plaintiff-employee failed to plead facts showing that leave restriction was a materially adverse employment action when all that was demanded of her was that she announce any arrival and departure during the day; noting that actions deemed to be materially adverse "cross[ed] the line from enforcement of standard employment policies (even if not uniformly applied) to harassing, badgering, and even threatening conduct").

### D.  Cumulative Effect of Cited Conduct

Morgan argues, in the alternative, that even if the acts of which she complains do not amount to materially adverse employment actions individually, they do in the aggregate.  *See* Opposition at 5-6 (citing, *inter alia*, *Rodríguez-Vives v. Puerto Rico Firefighters Corps of P.R.*, 743 F.3d 278, 285 (1st Cir. 2014); *Ferrante v. MAS Med. Staffing*, No. 2:13-cv-00211-JAW, 2015 WL 1401023, at *26 (D. Me. Mar. 26, 2015)).  SSA rejoins that the First Circuit made clear in *Billings v. Town of Grafton*, 515 F.3d 39, 54 n.13 (1st Cir. 2008), that claims predicated on the "collective effect" of retaliatory actions are essentially retaliatory hostile work environment claims – the very claims that Morgan has now abandoned.  *See* Reply at 3 n.4.  She states that, to the extent that this court nonetheless entertains a hostile work environment theory, she relies on relevant arguments contained in her motion.  *See id.*

In *Billings*, the First Circuit observed that "retaliatory actions that are not materially adverse when considered individually may collectively amount to a retaliatory hostile work environment."  *Billings*, 515 F.3d at 54 n.13.  However, it noted that, because the plaintiff-employee had *not* made an argument about the collective effect of the actions of which she complained, it had considered them only individually.  *See id.*

*Billings* indeed suggests that a Title VII claim of retaliation can be predicated on either discrete acts or their collective effect in the form of a hostile work environment (or both). *Rodríguez-Vives* cannot fairly be read to hold otherwise.  While, in *Rodríguez-Vives*, the First Circuit held that a plaintiff-employee's allegations of a series of retaliatory actions "cumulatively . . . plausibly paint[ed] a picture that would allow a factfinder to find the [defendant-employer's] conduct sufficient to deter a reasonable person from challenging the [defendant-employer's] discriminatory hiring practices had she known she would be subjected to these abuses if successful[,]" *Rodríguez-Vives,* 743 F.3d at 285, it did so in the context of analyzing whether the district court had properly granted the defendant-employer's motion to dismiss her complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief could be granted, *see id*. at 286.

In that context, "[t]here need not be a one-to-one relationship between any single allegation and a necessary element of the cause of action."  *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 55 (1st Cir. 2013).  Rather, "[w]hat counts is the cumulative effect of the [complaint's] factual allegations."  *Id.* (citation and internal quotation marks omitted).  *See also Rodríguez-Vives*, 743 F.3d at 286 ("Given the cumulative weight of [the plaintiff-employee's] allegations, . . . we need not decide whether each of these individual allegations would, standing alone, be sufficient to state a plausible claim of retaliation under Title VII.").

Nor did this court in *Ferrante* analyze the cumulative effects of asserted retaliatory actions separate from a hostile work environment rubric.  To the contrary, the court noted that, "although a typical adverse employment action involves a discrete change in the terms and conditions of employment (say, a discharge, demotion, or reduction in pay), workplace harassment, if sufficiently severe or pervasive, may in and of itself constitute an adverse employment action

sufficient to satisfy the second prong of the prima facie case for Title VII retaliation cases." *Ferrante*, 2015 WL 1401023, at *28 (citation and internal quotation marks omitted).[47]

Therefore, SSA makes the more persuasive argument: that, in this circuit, the cumulative effects of asserted retaliatory actions are to be analyzed as a retaliatory hostile work environment claim.

Yet, SSA reads too much into Morgan's opposing brief in arguing that she "has now apparently abandoned her retaliatory hostile work environment claim, and is instead proceeding on a 'discrete acts' theory of retaliation." Reply at 2. While Morgan disputes that it is necessary to analyze the cumulative effects of retaliatory acts through a hostile work environment framework, she plainly argues that the actions of which she complains cumulatively amounted to retaliation for protected activity. *See* Opposition at 5-6. Nonetheless, her evidence falls short of generating a triable issue.

The actions of which Morgan complains were not, as a matter of law, "sufficiently severe or pervasive" to constitute a retaliatory hostile work environment. *Ferrante*, 2015 WL 1401023, at *28 (citation and internal quotation marks omitted). In *Ferrante*, this court found a triable claim of a retaliatory hostile work environment when a plaintiff-employee offered evidence of 21 alleged retaliatory acts during an approximately five-month period, including repeated instances of the reassignment of her job responsibilities to other employees, assignment of blame for the misfiling of charts, denial of a leave request, failure to invite her to an office get-together, omission of her

---

[47] Morgan cites two other cases, *Putman v. Secretary, Dep't of Veterans Affairs*, 510 Fed. Appx. 827, 831 (11th Cir. 2013), and *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011), for the proposition that it is appropriate to consider whether the cumulative effect of individual retaliatory acts could dissuade a reasonable worker from pressing a charge of discrimination. *See* Opposition at 5-6. These cases do stand for that proposition. *See Putman*, 510 Fed. Appx. at 831; *Quinn*, 653 F.3d at 751. However, as discussed above, the First Circuit has signaled that one must consider the cumulative effect of individual retaliatory acts through the lens of a hostile work environment analysis.

name on several occasions from staff rosters, and failure to include her in a supervisor's meeting that she believed she was supposed to attend. *See id.* at 29-30.

By contrast, in this case, Morgan was unaware of the existence of the Korupp complaints until it was clear that no action would result from them, and she offers no cognizable evidence that Sax's disclosure of the existence of an OIG investigation or her supervisors' step-up in scrutiny of her time and attendance compliance caused harms beyond "the ordinary tribulations of the workplace[.]" *Burlington Northern*, 548 U.S. at 68 (citation and internal quotation marks omitted).

Likewise, in *Rodríguez-Vives*, the First Circuit observed that "several of the specific acts alleged by [the plaintiff-employee, a female firefighter,] by themselves go quite a ways toward making out a claim[,]" citing, as examples, (i) "the alleged refusal of [her] superiors to allow her, like others, to travel on fire vehicles to get lunch[,]" which "might be an adverse employment action on its own[,]" and (ii) her "allegation that she was assigned to cook and clean rather than to perform the same jobs as others in the station," which might, depending on the surrounding facts, "make plausible a finding that there was an adverse employment action." *Rodríguez-Vives*, 743 F.3d at 285-86.

Morgan identifies no comparably harmful action or collection of actions.

## IV.  Conclusion

Morgan having conceded that SSA is entitled to summary judgment as to her sex discrimination and age discrimination claims (Counts II and III) and having failed to make out a triable issue of the existence of a materially adverse employment action with respect to her retaliation claim (Count I), I recommend that the court grant SSA's motion for summary judgment as to all claims against it.

## *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof.   A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 7th day of December, 2016.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge